# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **NANCY KOEHLER, ET AL.,** | |
| **Plaintiffs,** | |
| | **Case No. 12-cv-2505-DDC-GLR** |
| **v.** | |
| **FREIGHTQUOTE.COM, INC. and FREIGHTQUOTE 401(k) PLAN,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiffs bring this action alleging that defendants Freightquote.com, Inc. and Freightquote 401(k) Plan ("Freightquote") violated the Fair Labor Standards Act ("FLSA"), the Kansas Wage Payment Act ("KWPA"), and the Employee Retirement Income Security Act of 1974 ("ERISA"). Specifically, plaintiffs allege that Freightquote improperly classified employees in the Account Representative/Freight Broker, Customer Activation Specialist, and Truckload Coverage Specialist job families as exempt from the FLSA's and KWPA's overtime requirements. They seek to recover unpaid regular pay, unpaid overtime, and related benefits and penalties for themselves and other similarly situated employees.

This matter comes before the Court on the following motions: (1) Freightquote's Motion for Protective Order (Doc. 172); (2) Freightquote's Motion for Summary Judgment (Doc. 141); (3) plaintiffs' Partial Motion for Summary Judgment (Doc. 145); and (4) plaintiffs' Motion for Class Certification (Doc. 140). After considering the parties' arguments, the Court denies Freightquote's Motion for Protective Order, denies in part and grants in part Freightquote's

Motion for Summary Judgment, denies plaintiffs' Motion for Summary Judgment, and denies plaintiffs' Motion for Class Certification.

## I.   Motion for Protective Order

On March 18, 2015, the Court issued a Memorandum and Order conditionally certifying plaintiffs' FLSA claims as a collective action (Doc. 170).  In that Order, the Court instructed the parties to confer and submit a joint proposed Notice to send to putative class members to notify them of this collective action and their right to opt into it.  The parties filed their joint Notice on April 1, 2015 (Doc. 171).

On April 29, 2015, Freightquote filed a Motion for Protective Order to Govern Procedure for Class Notice Administration.  Plaintiffs have hired Class Action Administration ("CAA"), a third-party class action administrator, to distribute the Notice, respond to questions from putative class members, and accept class members' Consents to Join this collective action. Freightquote's motion seeks an order requiring CAA to (1) include a statement about Freightquote's defenses in its automated response to putative class members who call with questions about the Notice and (2) provide Freightquote's lawyers with copies of reports CAA will provide to plaintiffs' lawyers during the notice period.  The Court addresses each request in turn.

*First*, Freightquote requests an order requiring CAA to include a statement about Freightquote's defenses in CAA's automated responses to putative class members who call with questions about the Notice.  Plaintiffs have tasked CAA with sending the parties' agreed-upon Notice to all putative FLSA class members who can be identified.  The Notice is eight pages long and describes, among other things, plaintiffs' claims and Freightquote's defenses.  *See* Doc. 171-1 at 4.  In particular, under the heading "How does Freightquote.com, Inc. Answer," the

Notice states:  "Freightquote.com, Inc. says that it properly paid its employees because their salaries and job duties made them exempt from the overtime requirements of the Fair Labor Standards Act and Freightquote.com, Inc. does not owe any overtime."  *Id.*

The Notice also provides a contact number for putative class members to call if they have questions.  According to the phone script provided by CAA, callers to this number first will hear an automated response that says:  "You have reached the Koehler v. Freightquote.com, Inc. Administrator.  Please select from one of the following options."  Doc. 172-1 at 4.  One of the options will direct callers to "press 1" "[t]o learn why you received a notice."  *Id.*

Freightquote takes issue with the script used to respond to callers who select this option. As proposed, it would read:

> Why You Received a Notice Phrase (0491)
>
> A class action lawsuit was filed against Freightquote.com, Inc. alleging that they violated the Fair Labor Standards Act by not paying overtime and treating Account Representatives, Customer Activation Specialists, and Truckload coverage Specialists as exempt from the overtime requirements of the Fair Labor Standards Act.
>
> You were mailed a notice because Freightquote.com Inc.'s records show that you currently work, or previously worked for, Freightquote.com, Inc. as an Account Representative, Customer Activation Specialist, Truckload Coverage Specialist or held a similar job title with similar job duties and compensation.
>
> To repeat this message, press 1
> To return to the main menu, press 2
> To speak with an Associate, press 3

*Id.*

Freightquote argues that this message is misleading because it omits any statement about Freightquote's defenses.  To remedy this, the company asks the Court to require CAA to include the following:  "Freightquote.com's position is that these employees' salaries and job duties cause them to be exempt from the overtime requirements of the Fair Labor Standards Act and it

3

does not owe any overtime." Doc. 172 at 6. Freightquote argues that this statement "would add approximately 8-10 seconds to the automated message," increasing its length minimally. Doc. 174 at 3.

The Court denies Freightquote's request to add language to the automated phone message about the company's defenses. "Under the FLSA, the Court has the power and duty to ensure that the notice is fair and accurate, but it should not alter plaintiff's proposed notice unless such alteration is necessary." *Wass v. NPC Int'l, Inc.*, No. 09-2254-JWL, 2011 WL 1118774, at *8 (D. Kan. Mar. 28, 2011) (quotation omitted). Every identifiable putative class member will receive the Notice form on which the parties have agreed. The Notice clearly states Freightquote's argument that its employees are exempt from the FLSA's overtime requirements. Because the Notice identifies Freightquote's primary defense, putative class members who call the CAA number will not be misled—they already will have seen Freightquote's position. Freightquote has failed to show that the Court must alter plaintiffs' proposed phone script to ensure that the Notice is fair and accurate. The Court therefore rejects Freightquote's first argument.

*Second*, Freightquote seeks an order requiring CAA to provide Freightquote's lawyers with copies of reports CAA will provide to plaintiffs' lawyers during the notice administration period. According to Freightquote, "CAA plans to keep records related to questions posed by callers and answers provided thereto, as well as records related to how many consents to join have been received, how [many] purported responses were returned with inadequate information, how many Notices were returned as undeliverable, etc." Doc. 174 at 4. CAA will provide these records to plaintiffs at various times during the notice period.

Freightquote argues that it is entitled to receive these records "to insure the integrity of the Notice/Opt-In process." *Id.* at 5. For instance, according to the company, "if callers are repeatedly asking questions about a particular Notice provision, then that may either highlight a problem with the Notice that should be corrected or identify an issue that may be explored during discovery of the opt-in members." *Id.* To support its argument, Freightquote cites generally to several cases which hold that third-party class action administrators must serve neutral roles.

In response, plaintiffs assert a host of objections, including that the CAA reports are protected by the work product privilege and the attorney-client privilege. But the Court need not address these issues to decide Freightquote's objection. Freightquote has provided no specific authority supporting its argument that it should receive the CAA reports. In the absence of such authority, the Court is not persuaded "to depart from the usual procedure of allowing plaintiffs and their counsel to manage the process of mailing notice to the putative class members." *Wass*, 2011 WL 1118774, at *13. Instead, the Court will require plaintiff's counsel to bring any problems with the Notice to defendant's attention, and it will look harshly on any effort to hide such problems, if any do emerge, from Freightquote's counsel. The Court rejects Freightquote's second request and therefore denies Freightquote's Motion for Protective Order entirely.

## II. Motions for Summary Judgment

Freightquote seeks summary judgment on several grounds. On plaintiffs' FLSA claims, it argues that (1) plaintiffs are exempt from the FLSA's overtime requirements under the Act's administrative exemption and (2) plaintiffs have failed to provide sufficient evidence of their damages. Freightquote also argues that it is entitled to summary judgment on plaintiffs' claims that it "willfully" violated the FLSA and on plaintiffs' KWPA and ERISA claims because they are entirely derivative of the FLSA claims. Plaintiffs' cross-motion seeks summary judgment on

just one issue—that Freightquote employees in three specific job families *do not* qualify as exempt from the FLSA's overtime requirements under the Act's administrative exemption. The Court addresses each argument in turn below.

### A.  Evidentiary Objections

Before turning to the uncontroverted facts pertinent to the motions for summary judgment, the Court addresses several evidentiary objections made by the parties.  Freightquote takes issue with eight declarations by former Freightquote employees (including Named Plaintiffs Nancy Koehler and Regina Brisbane) that plaintiffs submitted in their brief opposing Freightquote's motion for summary judgment.  *See* Docs. 157-3, 4, 5, 6, 7, 10, 11, and 12. Freightquote argues that the Court should ignore portions of those employees' declarations that contradict earlier deposition testimony as attempts to create sham fact issues.

A district court can disregard evidence on summary judgment if it "constitutes an attempt to create a sham fact issue." *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (quotation omitted).  To determine whether an affidavit (or declaration) tries to create sham fact issues, the Tenth Circuit has instructed courts to consider whether:  "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* (citation omitted).  But because Freightquote fails to address any of the Tenth Circuit's factors or identify any portions of the eight declarations that contradict earlier deposition testimony, the Court rejects Freightquote's argument.

For their part in this dispute, plaintiffs argue that the Court should disregard four exhibits submitted by Freightquote in support of its motion for summary judgment.  First, plaintiffs object

to Freightquote's Exhibit E, titled "Defendants' Responses to Plaintiff's Fifth Revised Topics for Examination."  *See* Doc. 142-6.  Plaintiffs argue that the Court cannot consider Exhibit E, a narrative response to plaintiffs' Rule 30(b)(6) deposition topics, under this Court's Local Rules. *See* D. Kan. Rule 56.1(d) ("All facts on which a motion [for summary judgment] or opposition is based must be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories, and responses to requests for admissions.").  The Court rejects this argument, however, because Freightquote adopted these responses by affidavit and D. Kan. Rule 56.1(d) explicitly provides that a party can present facts in support of a motion for summary judgment by affidavit.  *See* Doc. 142-3 at ¶¶ 3-4; *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2722 (3d ed.) ("Exhibits that have been properly made a part of an affidavit also may be considered.").  Plaintiffs also argue broadly that Exhibit E "constitutes hearsay without an exception."  Doc. 157 at 103.  But plaintiffs make no attempt to explain how this exhibit is hearsay and, in any case, the Court disagrees.  The Court therefore considers Freightquote's Exhibit E on summary judgment.

Second, plaintiffs argue that the Court should ignore three exhibits—Exhibits J, L, and M.  These are questionnaires that various Freightquote employees completed after plaintiffs filed this lawsuit.  Plaintiffs assert that the questionnaires also violate D. Kan. Rule 56.1 because, apparently, they are not affidavits or declarations.  The Court agrees.  The questionnaires are not sworn, so they are not affidavits.  And 28 U.S.C. § 1746 governs declarations for purposes of summary judgment.  To be an admissible declaration under § 1746, the declarant must "subscribe[]" that the statement is true under penalty of perjury.  28 U.S.C. § 1746.  To be properly subscribed to, a declaration must include language substantially similar to the following

statement:  "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct," followed by a date and a signature.  *Id.*  But the questionnaires that Freightquote attaches say only, "These statements are truthful and, to the best of my knowledge, they are accurate."  *See, e.g.*, Doc. 142-12 at 3.  Thus, they do not comply with § 1746 and are not admissible as declarations.

Freightquote also argues that they qualify as "documents" or "other materials" under Fed. R. Civ. P. 56(c)(1)(A), and that they are properly authenticated in an affidavit by Julianne P. Story, one of Freightquote's attorneys in this case.  But to be properly authenticated, "the affiant must be a person through whom the exhibits could be admitted into evidence."  10A Wright, Federal Practice and Procedure § 2722.  Ms. Story cannot authenticate these questionnaires because they contain information of which she has no personal knowledge.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . .").  As a result, the Court concludes that Freightquote's Exhibits J, L, and M are inadmissible.

**B.  Uncontroverted Facts**

The following facts are uncontroverted or, where controverted, are stated in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Freightquote is a logistics advisor and shipping broker headquartered in Kansas City, Missouri.  Broadly speaking, Freightquote advises its customers on available shipping solutions and then arranges shipments with carriers to meet customer needs.  This process involves at least two steps.  First, Freightquote obtains the customer's agreement to ship a product using Freightquote's services.  Second, Freightquote finds carriers who will agree to ship the products

according to the needs of its customer.  Generally, Freightquote profits when its customers pay

Freightquote more than Freightquote pays its carriers.  The difference between what the

customer pays and what Freightquote pays the carrier is called the "gross margin."

In delivering its services, Freightquote employs individuals in a variety of job positions.

They include the three positions at issue in this lawsuit—Account Representatives/Freight

Brokers, Customer Activation Specialists, and Truckload Coverage Specialists.  The Account

Representative/Freight Broker job family encompasses several job titles.  The different titles

generally signify seniority and the amount of business an employee handles, but all such jobs

share the same essential job duties.  This is also true of the Customer Activation and Truckload

Coverage job families.

Currently, Freightquote and its subsidiaries employ individuals in the relevant job

categories primarily in two states, Missouri and Minnesota.  Before June of 2013, Freightquote's

headquarters were located in Lenexa, Kansas.  During that time, Freightquote had employees in

Kansas, Pennsylvania, and elsewhere.  Employees in the Account Representative/Freight Broker

family of jobs now work from Freightquote's locations in Missouri and Minnesota, although a

few work remotely from different locations.  All employees in the Truckload Coverage family of

jobs work from Freightquote's location in Kansas City, Missouri.  Freightquote has eliminated

the Customer Activation job category.

*The Job Duties of Account Representative/Freight Broker Employees*

Named Plaintiffs John Smith and Scott Matney seek to represent employees in the

Account Representative/Freight Broker job family.  The following job titles are within the

Account Representative/Freight Broker family of jobs:  Account Representative, Account

Manager, Sales Executive, Senior Account Manager, Account Executive, Senior Account

Executive, Senior Account Executive I, Senior Account Executive II, Senior Account Executive III, Senior Account Executive IV, Senior Account Executive V, Freight Broker, Freight Broker-Account Manager, Freight Broker-Senior Account Manager, Freight Broker-Account Executive, Freight Broker-Senior Account Executive, and Freight Broker-Trainee.  The job titles within the Account Representative/Freight Broker family of jobs are part of Freightquote's Sales Department.  The Sales Department focuses on selling Freightquote's shipping services to customers.  The Account Representative/Freight Broker group is by far the largest of the three job families at issue in this case, and all such employees share the same essential job duties.

The parties broadly agree that Account Representative/Freight Brokers interact with Freightquote's customers and help them ship their goods.  It is undisputed that Account Representative/Freight Broker employees spend some of their time calling potential or current customers to convince them to use Freightquote to ship goods.  Generally, these employees make 30-100 outbound calls each day for prospecting purposes, although the number fluctuates depending on the seniority of a particular employee and the attendant book of business.  This activity accounts for 10-25% of Account Representative/Freight Broker employees' time.  Freightquote uses a "daily scorecard" that tracks employees' call volume, gross margin, and talk time, among other things, and allows employees to see how they are performing each day.

When speaking with a customer, Account Representatives/Freight Brokers generally follow a similar process.  They first determine if the particular customer has a Freightquote account.  If the customer does not, then the Account Representative/Freight Broker normally establishes one.  Once an account is active, the employee asks questions to arrive at a price quote for how much Freightquote will charge the customer to ship its goods.  These questions usually include:

10

<u>Questions Seeking Information About Logistics:</u>

- Zip code, city, and state of pickup and delivery locations;

- Type of pick-up and delivery locations (*e.g.*, residence, business, tradeshow, convention, construction site);

- Necessity of appointments for pickup or delivery;

- Whether pick up or delivery locations have limited access (*e.g.*, government facility);

- Interest/ability of customer or receiver to drop off or pick up freight at a terminal;

- Whether pick up or delivery requires inside access;

- Whether the shipment must be set up as a blind shipment; and

- Payment arrangements (*e.g.*, Collect on Delivery).

<u>Questions Seeking Information About Equipment Needs:</u>

- Availability of a dock or forklift at the pickup or delivery location; and

- Necessity of equipment for pick up or delivery (*e.g.*, liftgate).

<u>Questions Seeking Information About Handling Requirements:</u>

- Number of handling units;

- Weight and dimension per handling unit;

- Item(s) to be shipped;

- Motor Freight Classification;

- Packaging of the freight; and

- Whether the shipment needs to be sorted or segregated by marks, brands, sizes, flavors, or other distinguishing marks.

<u>Questions Seeking Information About Insurance or Special Permit Requirements:</u>

- Whether the goods are new or used;

- Whether the material is hazardous;

- The value of the shipment; and

- Whether the carrier can provide adequate carrier liability.

Once an Account Representative/Freight Broker obtains this information, he or she runs a price quote.  Sometimes, the Freightquote computer system suggests a price quote.  Other times, however, Account Representative/Freight Broker employees have to call prospective carriers and negotiate pricing.  If the Freightquote computer system suggests rates for a particular shipment, then the employee informs the customer about carrier options and pricing.  Freightquote says that Account Representatives/Freight Brokers have discretion to increase or decrease the price within broad parameters (usually a range of about 40%) or to request approval beyond these parameters.  The company also asserts that the pricing decision requires Account Representatives/Freight Brokers to incorporate a significant amount of knowledge about the trucking industry, the particular customer, and possible carriers, all of which they do without significant supervision.  Freightquote states that Account Representatives/Freight Brokers can set up their workdays as they see fit.

Plaintiffs dispute this description.  They cite affidavit testimony from several former Account Representative/Freight Broker employees who say that they negotiated with customers, but only within limited parameters.  Plaintiffs assert that Account Representatives/Freight Brokers typically accept the quote indicated by the Freightquote computer system and cannot deviate from it without supervisor approval.  Thus, plaintiffs argue that Account Representatives'/Freight Brokers' primary task is to take quotes provided by the computer system and dictate those terms to the customer.  They assert that these employees do not have

significant discretion in performing their duties because, among other things, Freightquote requires them to spend a prescribed amount of time on the phone.

Aside from calling customers and quoting prices, Account Representative/Freight Broker employees perform other duties. They sometimes assist customers with tracking shipments, the parties agree. Account Representatives/Freight Brokers also play a role when shipments are damaged in transit. Freightquote asserts that these employees are "advocates" for customers with the company's internal claims department and with carriers. Plaintiffs dispute this characterization, arguing that when freight is damaged, these employees simply refer the customer to the claims department and play no role in determining liability. Finally, Freightquote states that employees generally "manage and grow customer and carrier relationships." Doc. 142 at 6. Plaintiffs respond that Account Representatives/Freight Brokers communicate with customers only to make sales, not to grow Freightquote's business generally.

Freightquote classifies employees in the Account Representative/Freight Broker job family, including Named Plaintiffs John Smith and Scott Matney, as exempt from the FLSA's overtime and minimum wage requirements. These employees earn wages in excess of $455 per week, plus commissions where applicable, but do not receive overtime pay for working more than 40 hours. Generally, Freightquote's commissioned employees receive commissions based on a percentage of Freightquote's gross margin. Freightquote deducts from Account Representative/Freight Broker employees' pay for full day absences if and when such employees are absent and have exhausted their Paid Time Off ("PTO"). Freightquote does not deduct from these employees' pay for partial day absences, unless such absences are designated as FMLA leave and no PTO is available.

*The Job Duties of Customer Activation Specialist Employees*

Named Plaintiff Regina Brisbane seeks to represent employees in the Customer Activation job family.  Freightquote has eliminated this category, but the following job titles once were within the Customer Activation family of jobs:  Customer Activation Specialist, Customer Activation Representative, and ADM-Prime.  All employees in these jobs shared the same essential job duties.  The job titles within the Customer Activation family of jobs were part of Freightquote's Sales Department.  The Sales Department focuses on selling Freightquote's shipping solutions to customers.

It is undisputed that the job duties of Customer Activation Specialists largely resembled those of Account Representative/Freight Broker employees.  Generally, Customer Activation employees undertook the same or similar actions as Account Representatives/Freight Brokers in quoting prices to customers.  The main differences between the two families of jobs were: (a) the Customer Activation employee did not contact leads to bring on new customers proactively but instead responded to warm leads and inbound calls; and (b) the Customer Activation employee managed the customer only for the first 30 days, after which time the customer was transferred to an Account Representative/Freight Broker.  In performing their job duties, Freightquote expected Customer Activation employees to spend at least three hours each day on the telephone.  Their call volume expectations were individualized based on how they performed compared to a target and the number of enrollments they received.

Freightquote classified employees in the Customer Activation family of jobs, including Named Plaintiff Regina Brisbane, as exempt from the FLSA's overtime and minimum wage requirements.  These employees earned wages in excess of $455 per week, plus commissions where applicable, and did not receive overtime pay for working more than 40 hours in a week.

14

Freightquote deducted from Customer Activation employees' pay for full day absences if such employees were absent and had exhausted their PTO.  Freightquote did not deduct from these employees' pay for partial day absences, unless such absences were designated as FMLA leave and no PTO was available.

*The Job Duties of Truckload Coverage Employees*

Named Plaintiff Nancy Koehler seeks to represent employees in the Truckload Coverage job family.  The following job titles are within the Truckload Coverage family of jobs: Truckload Carrier Specialist, Senior Truckload Carrier Specialist, Lead Truckload Carrier Specialist, Principal Truckload Carrier Specialist, Truckload Coverage Representative, Senior Truckload Coverage Representative, Truckload Coverage Specialist, and Truckload Coverage Lead.  All employees in these jobs shared the same essential job duties.  The job titles within the Truckload Coverage family of jobs are part of Freightquote's Coverage Department.  The Coverage Department's principal function is to obtain carriers for shipments or loads that have been booked by Freightquote for its customers.  The goal of Truckload Coverage employees is to maximize Freightquote's profits by covering shipments at the lowest possible price.

Freightquote develops the process for acquiring coverage on truckload shipments and trains these employees on it.  The first step in the process of matching a carrier to a shipment, the parties agree, is determining which loads should be covered.  Each employee has a load board which lists the shipments that need to be covered by the employees on the employee's team.  Freightquote argues that each Truckload Coverage Specialist has discretion to decide the order in which each load is covered.  But Named Plaintiff Nancy Koehler asserts that her managers gave her direction about which loads to cover and that she lacked the discretion to prioritize loads on her own.

However selected, once the Truckload Coverage employee settles one, the employee reviews the details of the load, such as its weight, the equipment needed, the destination, the timeframe, and whether permits are needed, among other things.  Based on the details of the load, the employee reviews available carriers, as provided by a Freightquote-supplied list, or seeks other options through a third-party load board listing of carriers.  Freightquote asserts that Truckload Coverage employees select, preliminarily, the best carrier for the load based on this information.  According to Freightquote, these employees then reach out to the carrier preliminarily selected, provide the carrier with the load details, confirm that the carrier can do the shipment, and then negotiate the shipping cost with the carrier.

Named Plaintiff Koehler describes a different process.  She asserts that after she gathered a list of available carriers, she called each of them to determine if they were willing to move the truckload for a rate suggested by the Freightquote computer system.  If a carrier was unwilling to do so, she would move to the next carrier on the list.  Once she found a carrier whose price was at or below the projected rate, she would select that carrier to transport the load.  She asserts that calls with carriers typically lasted less than one minute.

The parties agree that Truckload Coverage Specialists must negotiate rates with potential carriers, at least sometimes.  To do so, they take the rate suggested by the Freightquote computer system and factor in other details from the load that would affect cost, like time and permits.  Freightquote claims that Truckload Coverage employees have discretion to accept a cost different from the rate suggested by its system without supervisor approval, although approval is required before accepting a rate that would result in a loss.  According to Freightquote, these employees have discretion to:  (1) accept a counteroffer made by the carrier; (2) make an additional offer to the carrier; (3) pass on a particular carrier and keep searching for a different

16

carrier; (4) contact the customer's Account Representative/Freight Broker or a supervisor to discuss rates; or (5) change the recommended cost of a load.

In contrast, Named Plaintiff Koehler asserts that she lacked the authority to negotiate any rate above the projected rate without supervisor approval, regardless of whether it would result in a loss. Thus, she could not accept counteroffers above the projected rate without asking her supervisor. Furthermore, she asserts that she negotiated rates only when she could find no carrier willing to transport a load at or below the projected rate.

After the carrier and the Truckload Coverage employee agree on a cost for a shipment, the employee checks to make sure that the carrier is compliant with applicable insurance rules. Some carriers are listed in Freightquote's computer system as "compliant." For others, the Truckload Coverage employee must collect insurance information and send it to Freightquote's Compliance Department. After that, the employee confirms the contact information for the carrier and clicks a button that says, "Cover this Load." This button sends a confirmation document to the carrier which it must sign and return to Freightquote. The Truckload Coverage employees sometimes, but not always, track shipments, depending on the importance of the shipment. Finally, Freightquote asserts that these employees must develop relationships with carriers for the benefit of the company and its customers. Koehler disputes that her job required her to do this.

Freightquote classifies employees in the Truckload Coverage family of jobs, including Named Plaintiff Brisbane, as exempt from the FLSA's overtime and minimum wage requirements. These employees earn wages in excess of $455 per week, plus commissions where applicable, and do not receive overtime for working more than 40 hours in a week. Freightquote deducts from Truckload Coverage employees' pay for full day absences if and

when such employees are absent and have exhausted their PTO.  Freightquote does not deduct

from these employees' pay for partial day absences, unless such absences are designated as

FMLA leave and no PTO is available.

### Freightquote's Holiday Policy

Freightquote's offices are closed on the following holidays under its Holiday Policy:

(1) New Year's Day; (2) Memorial Day; (3) Independence Day; (4) Labor Day;

(5) Thanksgiving (1-2 days), and (6) Christmas (1-2 days).  Freightquote's Holiday Policy, in

effect since August 3, 2007, states, "Employees who do not work on their scheduled workday

prior to or after a holiday and fail to follow proper call-in and approval procedures will forego

receipt of holiday pay."  Under the Holiday Policy, if an employee is absent on the Friday before

a paid Monday holiday when Freightquote's offices are closed and the employee fails to follow

proper call-in procedures for the Friday absence, Freightquote will not compensate the employee

for the Monday holiday.

### Nancy Koehler

Named Plaintiff Nancy Koehler worked for Freightquote from August 2007 to April

2012.  Beginning in April 2010, Koehler accepted a position in the Truckload Coverage job

family, as a Truckload Coverage Specialist, and remained in that position until Freightquote fired

her.  In her Truckload Coverage position, Koehler earned wages of more than $455 per week.

For a time, she also received commissions.  When she worked as a Truckload Coverage

Specialist, Koehler's regular schedule was an eight-hour shift from 6:00 a.m. to 3:00 p.m. or 6:30

a.m. to 3:30 p.m., with a one-hour lunch break and two paid 15-minute breaks, which she used as

smoke breaks.  Koehler states that she worked between 10 and 12 hours of overtime each week

and that she typically worked more at the end of the month.

She also testified that she kept contemporaneous records of her work hours on a calendar she maintained throughout her employment.  During discovery, Koehler produced this calendar, which recorded hours from December 2010 to March 2012.  She testified that her sole purpose in maintaining the calendar was "to keep track of [her] hours" and that she used the calendar only to record the hours she worked.  The calendar does not support her contention that she worked an average of 10-12 hours of overtime each week.

In her 2011 performance review, which Koehler received in January 2012, Koehler's manager, Julie Thornton, rated Koehler as "needs improvement" in the areas of work habits, initiative, problem solving, and decision making.  Ms. Thornton further noted that Koehler had trouble building relationships with carriers, and that at times Koehler would call carriers who were not the best fit for the load simply to increase her call numbers.  Freightquote also told Koehler that she needed to improve her decision-making skills, trust her own judgment, and think more independently.  In March and April 2012, it warned her about her failure to meet performance expectations and placed her on performance improvement plans ("PIPs"), which jeopardized her continued employment.  Freightquote told Koehler that she must improve her coverage performance, demonstrate ownership of her regularly assigned responsibilities, manage multiple priorities, and not treat the customer or carrier "just as a transaction."  Koehler believes that her job performance improved, but Freightquote disagreed.  It terminated her employment on April 20, 2012.

*Regina Brisbane*

Named Plaintiff Regina Brisbane worked for Freightquote from October 2005 to February 2010.  During her employment, Brisbane held positions in the Customer Activation and Account Representative/Freight Broker job families, including the following positions:  New

19

Business Representative (October 2005-May 2008) and Customer Activation Specialist (April

2009-February 2010).  When Regina Brisbane first worked in the Customer Activation role, her

scheduled work hours were from 9:00 a.m. to 5:00 p.m.  She states that during this period of time

she worked every night until 7:00 p.m.  At some point thereafter, her schedule changed to 10:00

a.m. to 7:00 p.m.  Although she could have taken a one-hour lunch break and two 15-minute paid

breaks, she testified that she worked through lunch four days each week and did not take the

offered breaks while in a Customer Activation job.  Other Customer Activation employees took

lunch and other breaks.  Brisbane asserts that after her schedule changed, she worked until 7:00

p.m., but no later, because Freightquote locked the building at 7:00 p.m..  Brisbane also says that

there were times when call volume was low, including for a period of time before her

termination when the phone lines were redirected from her team.  Despite these slow periods, she

estimates that she worked 15-25 hours of overtime every week the entire time she was in a

Customer Activation role.  Brisbane has not produced and does not possess any records of the

hours she worked while employed by Freightquote.  At her deposition, Brisbane initially testified

that she did not keep records of her hours worked.  Later, she admitted that she had kept such

records but had thrown them away.

In 2007 and again in 2008, while working as a New Business Representative, Brisbane

received two separate PIPs about her work performance.  During her time as a Customer

Activation Specialist, Freightquote told her that she needed to improve her decision making.

Freightquote fired Brisbane on February 2, 2010.

*John Smith*

Named Plaintiff John Smith worked for Freightquote from August 2004 to February

2013.  During his employment, Smith held positions in the Account Representative/Freight

Broker job family, including New Business Representative, Account Manager, Account Executive, Senior Account Executive, and Senior Account Manager.  Although his job title changed over the years, depending on his seniority and his book of business, he essentially performed the same job duties throughout his employment.  At all relevant times, Smith earned over $455 per week.  Although Smith initially worked out of Freightquote's Lenexa, Kansas office, he moved to Oklahoma in January 2011 and continued working remotely from there for the balance of his time with Freightquote.

Smith asserts that his hours varied during different periods of his employment.  Before August 7, 2012, when he received his first 2012 PIP, Smith estimates that he worked 45-50 hours per week.  After August 7, 2012, but before taking a medical leave of absence in September 2012, Smith estimates that he worked 12 hours per day.  Smith acknowledges that he did not work at all during the several weeks in September and October 2012 when he was on medical leave.  Finally, in the four months or so following his return from medical leave in October 2012 through the end of his employment in February 2013, Smith asserts that he worked significantly fewer hours (due to doctor's orders) and that he did not know whether he worked more than 40 hours per week.  Smith also testified at his deposition that he could not recall and could not estimate how many hours he worked in 2010 or 2011.  Besides e-mails, Smith does not have any other records that would allow him to recreate the hours he worked in 2010 or 2011 accurately.

During his deposition, Smith acknowledged that he kept a log of his actual hours worked for about one month in or around August 2012 (the time during which he claims to have worked 12-hour days).  The log included his start times and end times on specific workdays.  Smith has not produced this log and states that he no longer has it.  He admitted that he performed his job

duties differently than some Account Representatives/Freight Brokers because he did not have much contact with carriers.

On February 20, 2008, Smith received a PIP for disrespectful behavior, disregard of management direction, and inappropriate comments. Smith received another PIP on August 7, 2012 for failing to hit performance targets. On September 7, 2012, Freightquote disciplined Smith again for failing to hit performance targets and escalated his PIP to a performance improvement plan II ("PIP II"), which is a final performance warning. The PIP II provided that Smith had to hit specific targets in September 2012. Smith failed to hit these targets in September or October 2012. By November 2012, Smith ranked 99th out of 100 employees in his tenure group on achieving performance targets. Smith again failed to meet his target in November 2012, December 2012, and January 2013, which eventually led Freightquote to terminate his employment.

*Scott Matney*

Named Plaintiff Scott Matney worked for Freightquote from September 2004 to March 2012. During his employment, Matney held positions in the Account Representative/Freight Broker job family. Although his job title changed over the years, his job duties remained the same. Matney's starting weekly wage was $1,307.69 per biweekly pay period, and he never earned a biweekly wage below this amount. Matney was scheduled to work either from 7:30 a.m. to 4:30 p.m. or 8:00 a.m. to 5:00 p.m., with an hour scheduled for lunch. Matney did not keep contemporaneous records of the hours he worked. He testified initially that, during the three months he was employed in 2012, he worked "a little over 40 [hours per week], but [he] couldn't be for certain." When pressed, Matney estimated that he worked 42.5 to 44.5 hours each week in 2012. Matney testified that he worked "roughly the same" hours in 2010 and 2011

as he did in the first three months of 2012.  Matney could not specify what hours he worked on particular days or whether he worked his "extra hours" before his scheduled start time, after his scheduled end time, or during his scheduled lunch time.  He said it was "a mixture of all three."

Matney testified that his role required him to consult with customers about their shipping needs and to try to help them find the best method to fit those needs.  In performing his job, Matney asserted that he had very little flexibility to negotiate prices; he had to get to know his customers' businesses and needs to some extent; he had to learn carrier reliability; his job varied based upon customer needs; he had discretion to determine the best use of his time on any given day; he could reject jobs from customers when Freightquote could not perform the shipping job; he could select the appropriate carrier for a job; and Freightquote permitted him to troubleshoot customers' problems.

During his employment, Matney's manager warned him that he needed to have more meaningful conversations with customers and prospects.  On January 5, 2012, Freightquote placed Matney on a PIP for failing to reach performance targets.  On March 6, 2012, Freightquote escalated Matney's PIP to a PIP II because he continued falling short of targets.  On March 6, 2012, Matney's performance metrics ranked 94th out of 96 employees in his tenure group.  Matney's performance deficiencies led Freightquote to terminate his employment on March 22, 2012.

### C.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625

23

F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### D.  Does Freightquote Qualify for the Administrative Exemption?

Under the FLSA, employees are entitled to overtime pay (*i.e.*, one and one-half times their regular rate) for any hours worked in excess of 40 hours per week, unless they fall within one of the various exemptions supplied by the Act.  29 U.S.C. §§ 207, 213.  Among the FLSA's exemptions is one that exempts from the overtime requirements of § 207 "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  The Department of Labor has issued the following regulations about the administrative exemption:

> (a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> > (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
> >
> > (2)  Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> >
> > (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.  It is the employer's burden to prove that an employee falls "plainly and unmistakably" within an FLSA exemption.  *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 826 (10th Cir. 2012) (quotation omitted).

The parties have filed cross-motions for summary judgment on the issue whether plaintiffs qualify as exempt under the administrative exemption.  Freightquote argues that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on each

of the three prongs of the administrative exemption test.  The burden is on Freightquote to prove

that plaintiffs are exempt, so it must succeed on all three prongs for the Court to grant summary

judgment in its favor.  Plaintiffs focus their argument on just one prong of the test.  Specifically,

they argue that employees in the three subject categories do not qualify under the second prong

of the administrative exemption test and, therefore, are *not* exempt from the FLSA's overtime

requirements.

### 1.  Salary Basis Test

The first prong of the administrative exemption test requires that the qualifying employee

must be compensated on a salary basis of at least $455 per week.  An employee is considered to

be paid on a "salary basis" if the employee "regularly receives each pay period on a weekly, or

less frequent basis, a predetermined amount constituting all or part of the employee's

compensation, which amount is not subject to reduction because of variations in the quality or

quantity of the work performed."  29 C.F.R. § 541.602(a).

Plaintiffs do not dispute that Freightquote paid employees in the Account

Representative/Freight Broker, Customer Activation, and Truckload Coverage job families more

than $455 per week.  But they argue that their compensation is subject to reduction under

Freightquote's Holiday Policy, and therefore Freightquote does not meet that portion of the

salary basis test.  Under the company's Holiday Policy, Freightquote's offices are closed on six

holidays throughout the year.  The policy provides, "Employees who do not work on their

scheduled workday prior to or after a holiday and fail to follow proper call-in and approval

procedures will forego receipt of holiday pay."  Thus, if an employee is absent on the Friday

before a paid Monday holiday when Freightquote's offices are closed and the employee fails to

follow proper call-in procedures for the Friday absence, Freightquote will not compensate the

26

employee for the Monday holiday.

In response, Freightquote argues that (1) the Holiday Policy is not an improper deduction under the salary basis test and (2) even if it is improper, plaintiffs have submitted no evidence that Freightquote ever deducted an employee's pay under the policy. The Court starts and ends with Freightquote's second argument. In *Auer v. Robbins*, the Supreme Court held that an employee is not exempt under the salary basis test "if there is either an actual practice of making . . . deductions [based on variations in quality or quantity of work performed] or an employment policy that creates a 'significant likelihood' of such deductions." 519 U.S. 452, 461 (1997). Thus, under *Auer*, an employee is not paid on a salary basis if there is either an actual practice of salary deductions *or* if an employee is compensated under a policy that clearly communicates a significant likelihood of deductions. *Id.* Plaintiffs argue that the Holiday Policy communicates a significant likelihood of deductions, so they are not paid on a salary basis under *Auer*.

The Court rejects plaintiffs' argument because the portion of *Auer* on which they rely is no longer good law. After *Auer* was decided, the Department of Labor issued a new set of regulations, which became effective on August 23, 2004. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122 (Apr. 23, 2004); *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 627-28 (6th Cir. 2009). The new, current regulations provide that "[a]n actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis." 29 C.F.R. § 541.603(a). The current regulations, then, omit *Auer*'s conclusion that a "significant likelihood" of deductions violates the salary basis test. The Tenth Circuit found this omission was an intentional one, noting that it is "doubtful in light of revised Department of Labor regulations requiring a plaintiff to show '[a]n actual practice of

making improper deductions,' rather than the theoretical possibility of such deductions," that a policy alone can violate the salary basis test. *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 705 (10th Cir. 2012) (quoting 29 C.F.R. § 541.603(a)). Following *McBride*, the Court concludes that plaintiffs must show an actual practice of deductions under Freightquote's Holiday Policy to create a genuine issue of material fact on the salary basis prong. *See Baden-Winterwood*, 566 F.3d at 627-28 (same). Plaintiffs have produced no evidence that Freightquote has reduced any employee's salary under the Holiday Policy. As a result, they have failed to create a genuine issue of material fact about whether Freightquote violated the salary basis test. The Court concludes that employees in the three subject job categories satisfy the first prong of the administrative exemption test because they have been compensated on a salary basis.

### 2.   Work "Directly Related" to "Management or General Business Operations"

The parties each seek summary judgment on the second prong of the administrative exemption test. To qualify as exempt under this prong, an employee's "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). Under this test, "a court must first determine the employee's primary duty, and then determine whether that primary duty disqualifies the employee from the FLSA's protections." *Maestas*, 664 F.3d at 827.

Factors to consider when determining an employee's primary duty include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 C.F.R. § 541.700(a).

An employee's primary duty is a question of fact. *Maestas*, 664 F.3d at 827. "Because the primary duty inquiry presents a question of fact, summary judgment is proper only if there [is] no genuine dispute regarding plaintiffs' primary duties." *Id.* at 828. The Tenth Circuit has described this as a "heavy burden." *Id.* at 829. Any gaps in the evidence favor the party opposing summary judgment. *Id.*

Once a court determines the employee's primary duty, it must decide whether that duty is "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). Department of Labor regulations provide guidance on what qualifies as "directly related to . . . management or general business operations":

> (a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. *To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.*
>
> (b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations[;] government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.
>
> (c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

29 C.F.R. § 541.201 (emphasis added).

The regulations therefore distinguish between work that involves "the running or servicing of the business" and work such as laboring "on a manufacturing production line or selling a product in a retail or service establishment." § 541.201(a). The regulations also provide examples of activities that are "directly related to management or general business operations." 29 C.F.R. § 541.201(b). "Administrative duties include work in areas like accounting, insurance, marketing, human resources, labor relations, and database administration." *Maestas*, 664 F.3d at 828 (citing 29 C.F.R. § 541.201(b)).

The Tenth Circuit has not provided detailed guidance about how a court should decide whether an employee qualifies under this prong. But other circuits have drawn an "important distinction" between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work that applies to the running of any business. *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009). The Ninth Circuit held in *Bratt v. County of Los Angeles* that the "essence" of an administrative job is that an administrative employee participates in "the running of a business, and not merely . . . the day-to-day carrying out of its affairs." 912 F.3d 1066, 1070 (9th Cir. 1990) (quotation omitted). More recently, the Ninth Circuit concluded that, "The administration/production distinction thus distinguishes between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself.'" *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) (quotation omitted). The Seventh Circuit characterized the distinction this way: "[W]hen an employee is engaged in the core function of a business, his or her task is not properly categorized as administrative." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012).

30

Plaintiffs cite an opinion from the Third Circuit which, the Court agrees, is factually analogous to this case. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 904-05 (3d Cir. 1991). In *Martin*, the plaintiffs were telephone sales personnel for an electrical equipment wholesaler. *Id.* at 902-03. The sales personnel had some authority to deviate from set price quotes and also called suppliers to restock items occasionally, which required them to negotiate the prices. *Id.* at 904. The Third Circuit concluded that the plaintiffs, who worked in these sales positions, were not "servicing" the general business operations of their employer by making wholesale sales. *Id.* Rather, they were production-side employees because "wholesale sales *is* [the defendant's] business." *Id.* at 905 (emphasis in original). The Third Circuit also noted that the salespersons' primary duty of making routine wholesale sales are not administrative in nature just because the sales inevitably involved some price and terms negotiations with customers, as those activities are "'part and parcel' of the activity of 'producing' sales." *Id.* at 904.

Along with servicing the employer's business, an employee also can qualify as an administrative employee if he or she performs work directly related to the management or general business operations of the *employer's customers*. 29 C.F.R. § 541.201(c). Specifically, "employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." *Id.* To determine whether an employee with significant customer interaction is exempt, the Second Circuit focuses on whether the employee's duties are akin to "day-to-day sales activities or more substantial advisory duties." *Davis*, 587 F.3d at 534. In *Davis*, for instance, the plaintiff's primary duty was selling loan products under the guide of detailed directions. *Id.* The Second Circuit noted that "[t]here is no indication that underwriters were expected to advise customers as to what loan products best met their needs and abilities." *Id.* Also, "[t]heir work is not related either to setting

'management policies' nor to 'general business operations' such as human relations or advertising, . . . but rather concerns the 'production' of loans—the fundamental service provided by the bank." *Id.* For those reasons, the Second Circuit concluded that the loan officers were not exempt advisors to their employer's customers. *Id.* at 535.

With these legal standards in mind, the Court now turns to the facts of this case. It is undisputed that Freightquote, at its core, facilitates freight shipments by connecting its customers with carriers. Generally, Freightquote's business involves two steps. First, customers agree to ship their products using Freightquote's services. Second, Freightquote finds carriers who will ship the products according to Freightquote's customers' needs. Essentially, Freightquote is a middle-man—it makes money when customers pay Freightquote more than Freightquote pays the carriers who actually transport the load. The Court must assess whether the "primary duty" of employees in the three job families at issue here—Account Representative/Freight Broker, Customer Activation, and Truckload Coverage—is to perform work directly related to the general business operations of Freightquote or Freightquote's customers.

(a) *Account Representative/Freight Brokers*

The parties broadly agree that Account Representatives/Freight Brokers interact with Freightquote's customers and help them ship their goods. But they disagree about the specific functions these employees perform to accomplish this task. It is undisputed that Account Representative/Freight Broker employees spend some part of their day calling potential or current customers trying to convince them to use Freightquote's services. Generally, the employees make 30-100 outbound calls each day for prospecting purposes, although those numbers fluctuate depending on the seniority of a particular employee or the size of his or her

book of business.  This activity accounts for 10-25% of Account Representative/Freight Broker employees' time.

When speaking with a customer, Account Representatives/Freight Brokers generally follow a similar process.  They first determine if the particular customer has a Freightquote account.  If not, the employee normally sets one up.  Once an account is active, the employee asks a series of questions, which he or she enters into Freightquote's computer system to arrive at a price quote.  Among other things, an Account Representative/Freight Broker determines: where the shipment is located; where it is going; the item being shipped; the date of the shipment; the value of the shipment; and whether the materials are hazardous.  Freightquote states that these employees also advise and educate customers about things like proper packaging requirements and the differences between types of insurance, although plaintiffs assert that this is rarely necessary.

Once the Account Representative/Freight Broker obtains the relevant information, he or she runs a price quote.  Sometimes, the Freightquote computer system suggests a price quote.  On some occasions, however, Account Representatives/Freight Brokers must call prospective carriers and negotiate with them about pricing.  If the Freightquote computer system suggests a rate for a particular shipment, the Account Representative/Freight Broker employee informs the customer about carrier options and pricing.  Freightquote states that Account Representatives/Freight Brokers have discretion to increase or decrease the price within broad parameters (usually a range of about 40%) or to request approval to go beyond the parameters.  The company also asserts that the pricing decision requires them to incorporate a significant amount of knowledge about the trucking industry, the particular customer, and possible carriers.

They do all of these things without significant supervision.  Freightquote asserts that Account Representatives/Freight Brokers can set up their workdays as they see fit.

Plaintiffs dispute this description.  They cite affidavits from several former Account Representative/Freight Broker employees who state that they had limited negotiating parameters with their customers.  They assert that they typically took the quote indicated by the Freightquote computer system and could not deviate from it without supervisor approval.  Thus, they argue that their primary task was taking quotes provided by the computer system and dictating those terms to the customer.  They do not believe that their duties involve significant discretion because, among other things, Freightquote required them to spend a certain amount of time on the phone.

Account Representative/Freight Brokers perform other duties besides calling customers and quoting prices.  The parties agree that sometimes they assist customers' efforts to track shipments.  Account Representative/Freight Broker employees also play a role when shipments are damaged in transit.  Freightquote states that these employees are "advocates" for customers with the company's internal claims department and/or with carriers.  Doc. 142 at 6.  Plaintiffs dispute this characterization, arguing that when freight damage occurs, Account Representatives/Freight Brokers simply refer the customer to the claims department and play no role in determining liability.  Finally, Freightquote states that employees generally "manage and grow customer and carrier relationships."  *Id.*  Plaintiffs respond that they communicate with customers only to make sales, not to grow Freightquote's business generally.

Based on these conflicting sets of evidence, the Court concludes that there is a genuine issue of material fact about the "primary duty" of Account Representative/Freight Broker employees which precludes summary judgment for either party.  Some of these employees'

34

duties are production-related.  It is undisputed that Account Representatives spend at least 10-25% of their time calling potential and existing customers to prospect for business.  This type of sales activity relates directly to producing services that are the primary output of plaintiff's business—connecting customers with carriers—and therefore is not administrative.  *See Martin*, 940 F.2d at 905 (holding that telephone salespersons are not administrative because "wholesale sales *is*" the defendant's business); *Davis*, 587 F.3d at 534 (distinguishing between "day-to-day sales activities" (production) and "more substantial advisory duties" (administrative)).

Account Representatives/Freight Brokers also communicate with customers and obtain information from them to formulate a price quote.  Under plaintiffs' evidence, this activity appears to be primarily sales-related.  According to plaintiffs, Account Representatives/Freight Brokers enter information prompted by Freightquote's computer system, the computer system creates a price quote, and the employees quote the price to the customer with little room to negotiate.  Freightquote uses a "daily scorecard" that tracks employees' call volume, gross margin, and talk time, among other things, and allows employees to determine how they are performing each day.  Plaintiffs argue that their primary job is to "manage and service" their assigned customers.  That is, according to plaintiffs, Account Representative/Freight Broker employees are expected to contact existing customers to see if they have shipping needs to fulfill, fill those needs, and maintain the details of their accounts so that their customers receive the services that they expect.

Freightquote retorts that plaintiffs' description significantly understates the job responsibilities of Freight Brokers/Account Representatives.  It characterizes these employees as "trucking and logistics experts, analyzing information from customers (including carriers' costs and services), determining what shipping options and services best meet their needs, negotiating

prices with customers, and promoting Freightquote's services."  Doc. 142 at 43-44.  Apart from

fulfilling customers' shipping needs, Freightquote argues that Account Representative/Freight

Broker employees ensure invoicing is done correctly, monitor account adjustments for re-

classifications/re-weighs, get involved in the claims process if there is a claim, ensure shipments

are delivered on time, and make sure trucks are covered.  Essentially, then, Freightquote asserts

that these employees spend much of their time on tasks beyond selling Freightquote's services to

customers.

   Because a factual dispute exists about the Account Representative/Freight Broker

employees' primary duty, the Court cannot grant summary judgment for either party.  Under the

facts produced by plaintiffs' version of the evidence, Account Representatives/Freight Brokers

are like the non-exempt "inside salespersons" in *Martin v. Cooper Elec. Supply Co.*, 940 F.2d at

898-99, performing primarily sales duties.  But under Freightquote's evidence and the facts it

would sponsor, these employees are like those in *Verkuilen v. Media Bank, LLC*, 646 F.3d 979

(7th Cir. 2011).  There, the Seventh Circuit concluded that an Account Manager for a software

development company qualified for the administrative exemption because "she acted as a bridge

between the software developers and the customers, helping to determine the customers' needs,

then relaying those needs to the developers and so assisting in the customization of the software,

and finally helping the customers use the customized software.  *Id.* at 980.

   In sum, there is a genuine issue of material fact about the primary duties of employees in

the Account Representative/Freight Broker job families.  The Court cannot determine on

summary judgment whether these employees are (or are not) administrative under the second

prong of the administrative exemption test.  The Court thus denies both parties' motions for

summary judgment on the question whether Account/Representatives/Freight Brokers are exempt employees.

(b) *Customer Activation Specialists*

It is undisputed that Customer Activation Specialists had job duties like those of Account Representative/Freight Broker employees.  The principal difference between the two job families is that Customer Activation employees did not do any prospecting for new business and managed customer relationships only for a short initial period before handing the customer off to an Account Representative/Freight Broker.  For substantially the same reasons stated in the preceding section, then, a genuine issue of material fact exists over the proper classification of Customer Activation employees' job duties.  The material dispute precludes summary judgment for either party.  As discussed, under plaintiffs' evidence, these employees are more like salespersons who talk directly with customers to provide the shipping service that is Freightquote's core business.  On the other hand, Freightquote's evidence, if accredited, shows that these employees have a vast range of duties extending beyond mere sales and into an advisory role.  The Court cannot resolve factual disputes on summary judgment and thus denies both parties' summary judgment motions on the issue whether Customer Activation Specialist employees are exempt.

(c) *Truckload Coverage Specialists*

The principal function of employees in the Truckload Coverage job family is to find a carrier and negotiate with it to move a truckload for a customer at the lowest possible cost. Freightquote develops the process for obtaining coverage on truckload shipments and trains Truckload Coverage employees to follow this process.  The parties agree that the first step in matching a carrier to a shipment is determining which loads should be covered.  Each employee

37

has a load board which lists the shipments that need to be covered by the employee or the relevant team.  Freightquote argues that each Truckload Coverage employee has discretion to decide the order to cover each load.  Named Plaintiff Koehler, a former Truckload Coverage employee, states that her managers told her which loads to cover and that she lacked discretion to prioritize loads on her own.

Regardless, once a Truckload Coverage employee settles on a load, he or she reviews its details, such as the weight, the equipment needed, the destination, the timeframe, and whether permits are needed, among other things.  The employee reviews available carriers, as provided by a Freightquote-supplied list, or seeks other options through a third-party load board listing of carriers.  Freightquote asserts that Truckload Coverage employees select, preliminarily, the best carrier for the load based on this information.  According to Freightquote, these employees then reach out to the carrier preliminarily selected, provide the carrier with the load details, confirm that the carrier can do the shipment, and negotiate the shipping cost with the carrier.

Named Plaintiff Koehler describes a different process.  She states that after gathering a list of available carriers, she would call each of them to determine if they were willing to move the truckload for a rate suggested by the Freightquote computer system.  If a carrier was unwilling to do so, she would move to the next carrier on the list.  Once she found a carrier whose price was at or below the projected rate, she would select that carrier to transport the load.  She asserts that calls with carriers typically lasted less than one minute.

The parties agree that Truckload Coverage Specialists must negotiate rates with potential carriers, at least sometimes.  To do so, they take the rate suggested by the Freightquote computer system and factor in other details from the load that would affect cost, like time and permits.  Freightquote claims that Truckload Coverage employees have discretion to accept a rate different

38

from the rate suggested by Freightquote's system without supervisor approval, although approval is required before accepting a rate that would produce a loss.  According to Freightquote, these employees have discretion to:  (1) accept a counteroffer made by the carrier; (2) make an additional offer to the carrier; (3) pass on a particular carrier and keep searching for a different carrier; (4) contact the customer's Account Representative/Freight Broker or a supervisor to discuss rates; or (5) change the recommended cost of a load.

In contrast, Named Plaintiff Koehler asserts that she lacked the authority to negotiate any rate above the projected rate without supervisor approval, regardless of whether it would result in a loss.  Thus, she asserts, she could not accept counteroffers above the projected rate without asking her supervisor.  Also, she says that she negotiated rates only when she could find no carrier willing to transport a load at or below the projected rate.

After the carrier and the Truckload Coverage employee agree on a cost for a shipment, the employee checks to make sure that the carrier is compliant with applicable insurance requirements.  Some carriers are listed in Freightquote's computer system as "compliant."  For others, the Truckload Coverage employee must collect insurance information and send it to Freightquote's Compliance Department.  After that, the employee confirms that he or she has accurate contact information for the carrier and then clicks a button which says "Cover this Load."  This button sends a confirmation document to the carrier which it must sign and return to Freightquote.  The Truckload Coverage employees sometimes, but not always, track shipments, depending on the shipment's importance.  Finally, Freightquote asserts that these employees must develop relationships with carriers for the benefit of the company and its customers. Koehler disputes that her job required her to foster relationships.

The Court must determine whether, in light of these competing versions of the facts, there is a genuine issue of material fact about Truckload Coverage employees' "primary duty" which precludes summary judgment.  It is undisputed that the "principal function" of the Truckload Coverage family of positions is to find and negotiate a carrier to move a truckload for a customer at the lowest possible cost.  Doc. 142 at 44.  Freightquote is in the business of connecting its customers with shippers.  By booking carriers to transport customers' loads, Truckload Coverage employees are necessary to produce the service that Freightquote provides.  This function is not accounting, marketing, or other typical administrative work "applicable to the running of any business." *Davis*, 587 F.3d at 535.

Freightquote focuses on the fact that, in its view, Truckload Coverage jobs require employees to exercise skill and discretion.  For instance, Freightquote asserts that these employees frequently negotiate prices with carriers and must use their knowledge and experience to find the best carrier for the load.  Even accepting these facts as true, "the border between administrative and production work does not track the level of responsibility, importance, or skill needed to perform a particular job." *Id.* at 532-33.  In *Martin*, the Third Circuit concluded that while sales inevitably involved some price/terms negotiations with customers by the sales employees at issue there, those activities were "part and parcel" with their activity of "producing sales" and therefore were not administrative ones.  940 F.3d at 904 (quotations omitted).  Considerations about the amount of discretion Truckload Coverage employees' possess certainly are relevant to the third prong of the administrative exemption test.  *See* 29 C.F.R. § 541.200(a)(3) (employee may be exempt if his duty "includes the exercise of discretion and independent judgment with respect to matters of significance.").  But they have less bearing on the issue whether an employee's function may be classified as administrative or production-

related.  *Davis*, 587 F.3d at 532-33 n.4.  Freightquote also argues that Truckload Coverage

Specialists "are the expert advisors and consultants to customers that the FLSA regulations

describe as exempt employees."  Doc. 142 at 45.  But there is no evidence that Truckload

Coverage Specialists ever communicate with Freightquote's customers—the shippers—so the

Court rejects this argument.  Because Truckload Coverage employees perform a core function of

Freightquote's business, the Court denies Freightquote's motion for summary judgment based on

the administrative exemption.

Whether *plaintiffs* are entitled to summary judgment on this prong presents a closer

question.  Summary judgment for plaintiffs is proper if there is no genuine dispute that

Truckload Coverage employees' "primary duty" is production-related, not administrative.

*Maestas*, 664 F.3d at 828.  Any gaps in the evidence work in the party opposing summary

judgment's favor.  *Id.* at 829.

Freightquote argues that Truckload Coverage employees perform other functions that, in

the Court's view, could be classified as "administrative."  Specifically, Freightquote asserts that

these employees "must develop carrier relations to create lasting partnerships for the benefit of

Freightquote and its customers."  Doc. 142 at 45.  The preamble to the current regulations states

that "the administrative operations of the business include the work of employees servicing the

business, such as . . . representing the company" and "promoting sales."  69 Fed. Reg. at 22,138

(quotations omitted).  To the extent Truckload Coverage employees generally develop

relationships with carriers outside the context of making contracts with carriers to ship their

customers' goods, one properly can classify these activities as administrative.  *See Schaefer-*

*LaRose*, 679 F.3d at 575 (holding that pharmaceutical sales representatives perform

administrative tasks because they "are the principal ongoing representatives of the company to the professional community").

The summary judgment record suggests that Truckload Coverage employees devote more time to finding carriers for shipments than developing relationships with carriers. Also, the parties appear to agree that this duty is not the "principal" duty of Truckload Coverage employees. But the record is not one-sided or clear on this point. Because any gaps in the evidence must be construed against plaintiffs' motion for summary judgment, the Court concludes that plaintiffs have failed to meet their "heavy burden" to show that there is no genuine issue of material fact about the primary duty of Truckload Coverage employees. *Maestas*, 664 F.3d at 829. For this reason, the Court denies plaintiffs' motion for summary judgment to the extent it argues that Truckload Coverage employees are not exempt under the second prong of the administrative exemption test.

### 3. Primary Duty Includes the Exercise of Discretion and Independent Judgment

The third prong of the administrative exemption test requires the employer to show that that the employees' "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Only Freightquote seeks summary judgment on this prong. Freightquote bears the burden to prove that it is entitled to summary judgment on all three prongs of the administrative exemption test, but, as discussed above, the Court concludes that genuine issues of material fact exist that preclude summary judgment on the second prong. As a result, the Court need not address whether the subject employees exercise discretion and independent judgment on matters of significance.

**E.  Have Plaintiffs Provided Sufficient Evidence of Their Damages?**

Next, Freightquote argues that it is entitled to summary judgment against the Named

Plaintiffs' FLSA claims because they have not produced sufficient evidence about the amount of

overtime hours that they allegedly worked.

**1.   Legal Standard for Proving Damages**

To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must

prove that he performed work for which he was not properly compensated.  *Anderson v. Mt.*

*Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946).  In *Anderson*, the Supreme Court established

the standard by which an employee must show the amount of his uncompensated work (in

essence, his damages) to survive summary judgment.  *Id.* at 687-88.

The FLSA requires employers to keep accurate records of the hours that their employees

worked.  29 U.S.C. § 211(c) ("Every employer subject to any provision of this chapter . . . shall

make, keep, and preserve such records of the persons employed by him and of the wages, hours,

and other conditions and practices of employment maintained by him . . . ."); *see also Riley v.*

*Town of Basin*, No. 91-8022, 1992 WL 86717, at *5 (10th Cir. 1992) (citing § 211(c) in an FLSA

overtime case) (unpublished opinion).  "When the employer has kept proper and accurate records

the employee may easily discharge his burden [to prove damages] by securing the production of

those records."  *Anderson*, 328 U.S. at 687.  But "where the employer's records are inaccurate or

inadequate and the employee cannot offer convincing substitutes," the Court concluded that the

"solution . . . is not to penalize the employee by denying him any recovery on the ground that he

is unable to prove the precise extent of uncompensated work."  *Id.* at 687.  Such a result would

contradict the "remedial nature" of the FLSA.  *Id.*  Instead, *Anderson* articulated the following

burden-shifting standard:

> In such a situation . . . an employee has carried out his burden if he proves that he
> has in fact performed work for which he was improperly compensated and if he
> produces sufficient evidence to show the amount and extent of that work as a
> matter of just and reasonable inference.  The burden then shifts to the employer to
> come forward with evidence of the precise amount of work performed or with
> evidence to negative the reasonableness of the inference to be drawn from the
> employee's evidence.  If the employer fails to produce such evidence, the court
> may then award damages to the employee, even though the result be only
> approximate.

*Id.* at 687-88.

Thus, on summary judgment, if an employer fails to provide accurate records, an employee need only present "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687. "[A]n employee's burden in this regard is not high." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (citing *Anderson*, 328 U.S. at 687) (remedial purpose of the FLSA militates against making employee's burden an "impossible hurdle")).

### 2. Analysis

Each Named Plaintiff has estimated, based on recollection, the average amount of overtime worked as a Freightquote employee.  Freightquote argues that this evidence fails to create a "just and reasonable inference" about the amount and extent of overtime that the Named Plaintiffs worked.  It asserts that plaintiffs' recollections about the hours they worked are mere "conclusory statements" which are insufficient to create a genuine issue of material fact about damages.  Doc. 142 at 49.

While it has not said so explicitly, the Tenth Circuit appears to permit a plaintiff to meet his burden under *Anderson* through estimates based on personal recollections.  In *Doty v. Elias*, the plaintiffs were waitresses and waiters who sued their employer under the FLSA for failing to pay minimum wage and overtime.  733 F.2d 720, 722 (10th Cir. 1984).  The district court

awarded damages to the plaintiffs after a bench trial, and the defendant appealed.  *Id.*  Among

other things, the defendant argued that the plaintiffs' evidence about the number of hours they

worked was "insufficiently precise" to support the district court's damage award.  *Id.* at 725.

After describing the *Anderson* legal standard, the Tenth Circuit rejected the defendant's

argument, stating:

> Each plaintiff in the instant case testified regarding the approximate number of
> hours he or she worked for [the defendant] Elias.  Elias offered testimony that at
> least some of plaintiffs' figures were exaggerations.  It is the job of the trial court
> to assess the credibility of witnesses and resolve conflicting testimony.   Its
> conclusions as to the number of hours that plaintiffs worked, although admittedly
> approximations, are supported by the evidence and thus are not clearly erroneous.

*Id.*

Thus, while *Doty* does not describe the contents of the plaintiffs' testimony explicitly, the

Court concluded that testimony based on recollection was sufficient to create a just and

reasonable inference about the proper amount of damages.  Other circuit courts also have held—

explicitly—that an employee's recollection about hours worked can satisfy the employee's

burden under *Anderson*.  *See Kuebel*, 643 F.3d at 362 ("It is well settled among the district courts

of this Circuit, and we agree, that it is possible for a plaintiff to meet this burden through

estimates based on his own recollection."); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770,

775 (7th Cir. 2013) ("The unreported time for each employee could be reconstructed from

memory, inferred from the particulars of the jobs the technicians did, or estimated in other

ways—any method that enables the trier of fact to draw a 'just and reasonable inference'

concerning the amount of time the employee had worked would suffice.").

Finally, our Court has held previously that a plaintiff can create a just and reasonable

inference of hours worked based on his recollection.  *See Robinson v. Food Serv. of Belton, Inc.*,

415 F. Supp. 2d 1232, 1235 (D. Kan. 2005).  In *Robinson*, Judge Lungstrum noted that because

the defendant had failed to keep track of their employees' hours, the "plaintiffs at trial were left

with their own best recollections of the hours that they worked . . . ." *Id.* at 1235-36.  He

concluded that such evidence was sufficient:

> Of course, the jury could have disbelieved plaintiffs' recollections or found those
> recollections inaccurate, but plaintiffs nonetheless were entitled to present their
> claims for damages to the jury based on their estimates (derived from plaintiffs'
> recollections) of actual hours worked.  Any other ruling would preclude an
> employee in an FLSA case from challenging inaccurate time records unless that
> employee knew from the outset that his or her employer was violating the FLSA
> by keeping inaccurate time records.

*Id.* at 1236.  Freightquote argues that Judge Lungstrum's reasoning does not apply here because

Named Plaintiffs Koehler, Brisbane, and Smith kept some contemporaneous records of the hours

they worked but now have lost them.  But Freightquote presents no evidence indicating that

plaintiffs should have kept contemporaneous records; to the contrary, Freightquote bears the

burden of keeping records of hours worked by its employees.

In light of this binding and persuasive authority, the Court concludes, generally, that

plaintiffs can satisfy their burden to create a "just and reasonable inference" about the amount of

overtime worked through estimates based on their recollections.  *Anderson*, 328 U.S. at 687.  The

Court turns now to evaluate whether the evidence specific to each Named Plaintiff will suffice.

    (a)  Nancy Koehler

Named Plaintiff Koehler worked as a Truckload Coverage Specialist from April 2010 to

April 2012.  At first, Koehler's regular shift lasted from 6:00 a.m. to 3:00 p.m., although it

changed at some point to 6:30 a.m. to 3:30 p.m.  She had a one-hour lunch break and two paid

15-minute breaks, which she used as smoke breaks.  Koehler testified that she averaged 10-12

hours of overtime per week over the course of her employment.  She argues that this testimony is

sufficient to satisfy the *Anderson* burden-shifting test, and, as discussed above, the Court concludes that an employee's estimate based on her recollection can meet this test.

Freightquote argues that Koehler previously has contradicted her overtime estimate, which warrants summary judgment in its favor. Koehler testified that during the course of her employment she kept a calendar where she recorded her work hours. The calendar, which she produced during discovery, runs from December 2010 to March 2012, a period shorter than her actual term of employment. The calendar records Koehler's daily overtime in five-minute increments but does not support her contention that she worked an average of 10-12 hours of overtime each week. Simply because the calendar is inconsistent with Koehler's testimony, however, does not mean that Freightquote is entitled to summary judgment. In *Doty*, discussed above, the defendant offered testimony suggesting that the plaintiffs had exaggerated their overtime estimates. 733 F.2d at 725. But the Tenth Circuit did not reject the plaintiffs' evidence out of hand based on this conflicting testimony. *Id.* Rather, it noted that it is the trier of fact's job "to assess the credibility of witnesses and resolve conflicting testimony." *Id.*; *see also Kuebel*, 643 F.3d at 364 ("[W]hatever inconsistency may exist between the estimates offered by [the plaintiff] during his deposition and those provided in his declaration, it is at most the type of inconsistency that the [defendant] should test through cross-examination at trial and allow the jury to weigh in determining the credibility of [the] plaintiff's testimony in support of his claims." (quotation omitted)). Thus, the Court concludes that the jury must weigh what effect, if any, to give the inconsistency between Koehler's calendar and her testimony.

By providing an estimate of overtime she worked, Koehler has satisfied her burden under *Anderson*. Freightquote fails to rebut Koehler's testimony, and the Court therefore denies Freightquote's motion for summary judgment against Koehler.

(b) Regina Brisbane

Named Plaintiff Regina Brisbane worked in both the Account Representative/Freight Broker and Customer Activation job families from October 2005 to February 2010, but she seeks to recover unpaid overtime under the FLSA only for her time as a Customer Activation employee.  Brisbane became a Customer Activation Specialist in April 2009.  When she first started in this role, her scheduled work hours were 9:00 a.m. to 5:00 p.m.  Brisbane testified that during this time, she worked every night until 7:00 p.m.  At some point, her schedule changed to 10:00 a.m. to 7:00 p.m.  Brisbane asserts that she worked no later than 7:00 p.m. after the schedule change because the building was locked at 7:00 p.m.  Brisbane was entitled to take a one-hour lunch break and two 15-minute paid breaks each day, but she testified that she worked through lunch four out of five days each week and did not take offered breaks.  Brisbane estimates that she averaged 15-25 hours of overtime each week during her time as a Customer Activation Specialist.

For largely the same reasons identified when discussing Named Plaintiff Koehler, the Court concludes that Brisbane has presented sufficient evidence to create a just and reasonable inference that she worked between 15 and 25 hours of overtime each week during her time as a Customer Activation Specialist.  Because her burden of proving damages is "not high," the Court concludes that her testimony makes a sufficient showing.  *Kuebel*, 643 F.3d at 362.

Brisbane admits that she kept contemporaneous records of the hours she worked as a Customer Activation employee but states that she threw them away before a move and no longer has them.  Freightquote characterizes this as "spoliation" of evidence and argues that the Court should weigh this spoliation in deciding whether Brisbane has met her burden under *Anderson*. "The doctrine of spoliation refers to the improper intentional destruction of evidence relevant to

48

a case." *Rowe v. Albertsons, Inc.*, 116 F. App'x 171, 174 (10th Cir. 2004).  "Spoliation sanctions are proper when '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'"  *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007)).  Here, no evidence suggests that Brisbane knew or should have known that litigation was imminent when she discarded her records.  The Court thus declines to sanction Brisbane because she did not retain the records.

By estimating the amount of overtime she worked, Brisbane has satisfied her burden under *Anderson*.  The Court therefore denies Freightquote's motion for summary judgment against Brisbane.

(c)  John Smith

Named Plaintiff John Smith worked for Freightquote in the Account Representative/Freight Broker family of jobs from August 2004 to February 2013.  Smith testified that he could not estimate how many hours he worked in 2010 or 2011.  From January 1, 2012 to August 6, 2012, he estimates that he worked between 45-50 hours per week.  From August 7, 2012 to sometime in September 2012, he estimates that he was working 12 hours per day.  Smith then took a medical leave, and during it he did not work at all.  Finally, Smith testified that from October 2012, when he returned from medical leave, through the end of his employment in February 2013, he cannot say whether he worked more than 40 hours per week.

Thus, Smith provides estimates of overtime hours worked only for January 1, 2012 to about September 2012.  The Court denies Freightquote's motion for summary judgment for that

time period for the same reasons it identified when discussing Koehler and Brisbane:  Smith provided an estimate based on his recollection.

Like Brisbane, Smith kept a record of hours for approximately one month in August 2012.  He has not produced this log and asserts that he lost it.  Freightquote again argues that the Court should take some action against Smith for spoliation.  But the Court declines to do so because the record contains no evidence showing that Smith knew or should have known that litigation was imminent.  *Turner*, 563 F.3d at 1149.  The Court cannot merely assume the existence of evidence sufficient to impose this duty at the relevant time, and it therefore denies Freightquote's motion for summary judgment against Smith for the January 2012 to September 2012 time period.

However, the Court grants Freightquote's motion for summary judgment as it applies to the rest of Smith's term of employment.  Smith provides no estimate of hours worked for these periods, so there is nothing from which the Court can draw a "just and reasonable inference" about the amount and extent of overtime.  *Anderson*, 328 U.S. at 687.

(d) Scott Matney

Named Plaintiff Scott Matney worked for Freightquote from September 2004 to March 2012 in the Account Representative/Freight Broker job family.  During his employment, Matney was scheduled to work from 7:30 a.m. to 4:30 p.m. or from 8:00 a.m. to 5:00 p.m.  Matney estimates that he worked between 42.5 and 44.5 hours each week in 2012 and that he worked "roughly the same" hours in 2010 and 2011.  He testified that he worked those hours by coming in early, working through lunch, and staying late.  Matney has provided an estimate of the hours he worked based on his recollection.  The Court therefore denies Freightquote's motion for summary judgment against Matney.

50

### F.  Plaintiffs' Derivative Claims

Counts IV, V, and VI of plaintiffs' Second Amended Complaint (Doc. 76) allege that Freightquote violated the KWPA.  Count VII alleges that Freightquote violated § 502(a)(1)(B) of ERISA.  Freightquote argues that these claims are entirely derivative of, and dependent on, plaintiffs' FLSA claims, which fail as a matter of law.  As discussed above, however, the Court concludes that genuine issues of material fact exist that preclude summary judgment on plaintiffs' FLSA claims.  For this reason, the Court denies Freightquote's motion for summary judgment against plaintiffs' KWPA and ERISA claims.

### G.  Did Freightquote "Willfully" Violate the FLSA?

Freightquote next argues that plaintiffs are limited to a two-year statute of limitations because they fail to show that Freightquote "willfully" violated the FLSA.  The FLSA provides a period of two years "after the cause of action accrued" in which a plaintiff may file a complaint for unpaid wages, overtime, or liquidated damages in federal or state court.  29 U.S.C. § 255(a).  The FLSA extends the limitations period to three years after such a cause of action accrues for violations that are "willful."  *Id.*  A plaintiff carries the burden of proving that a violation is willful.  *Donovan v. M & M Wrecker Serv., Inc.*, 733 F.2d 83, 85 (10th Cir. 1984).

A violation is willful if the employer "'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA].'"  *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1334 (10th Cir. 1998) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  Under this standard, willfulness requires more than mere negligence.  *Richland Shoe*, 486 U.S. at 135.  If the employer acts unreasonably, but not recklessly, in determining its obligations under the FLSA, the resulting actions are not willful in nature.  *Id.* at 135 n.13.  To survive summary judgment, then, the "record must contain evidence that the employer knew or should have known

51

of an appreciable possibility that its employees were covered by the Act." *Donovan*, 733 F.2d at 85.

Plaintiffs claim that Freightquote had a "reckless disregard for its obligations under the FLSA," so they are entitled to a three-year statute of limitations. Doc. 157 at 128. Plaintiffs' only support for this assertion comes from the deposition of Freightquote's corporate representative, Brian Zamzow. Mr. Zamzow testified that (1) he does not know the factual basis for Freighquote's decision to classify the employees in the subject job categories as exempt; (2) he cannot identify a date when Freightquote reviewed its FLSA policies; and (3) he does not know when the company last consulted legal counsel for advice on its employees' exempt classifications.

Courts have found that an employer's failure to inquire whether its policies violate the FLSA can constitute a willful violation. *See Hardrick v. Airway Freight Sys., Inc.*, 63 F. Supp. 2d 898, 904 (N.D. Ill. 1999) (holding that the defendant's failure to investigate whether its overtime policy complied with the FLSA showed reckless disregard). But Mr. Zamzow's testimony does little to show that Freightquote failed to investigate whether its policies are legal. As Freightquote points out, Mr. Zamzow was not involved in deciding which employees are exempt. Freightquote identified three human resources officers who were involved in the decision, but plaintiffs declined to depose any of them. Freightquote also asserted that evidence about when it last reviewed its FLSA policies is protected by the attorney-client privilege, a determination plaintiffs do not challenge here.

Thus, Freightquote has demonstrated that plaintiffs lack evidence to support their willfulness claim. As a result, plaintiffs "may not rest on [their] pleadings but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which

52

[they] carr[y] the burden of proof." *Kannady*, 590 F.3d at 1169 (quotation omitted).  Plaintiffs

rely on Mr. Zamzow's testimony, but, as already discussed, it fails to create a genuine issue for

trial.  The Court therefore grants summary judgment in Freightquote's favor against plaintiffs'

claim that it willfully violated the FLSA.  Plaintiffs are limited to the standard two-year statute of

limitations on their FLSA claims.

### H.  Summary of Summary Judgment Rulings

The Court has made several rulings on the parties' cross-motions for summary judgment,

which it will summarize here.  Both parties argue that they are entitled to summary judgment on

whether the administrative exemption covers employees in the Account Representative/Freight

Broker, Customer Activation Specialist, and Truckload Coverage Specialist families of jobs, but

the Court denies both motions.  Freightquote seeks summary judgment on two other grounds.

First, it argues that the Named Plaintiffs failed to present sufficient evidence to show the amount

of overtime that they allegedly worked.  The Court rejects this argument for three of the four

Named Plaintiffs.  But the Court grants Freightquote's motion with respect to Named Plaintiff

Smith, except for the period of January to September 2012.  Second, Freightquote seeks

summary judgment on plaintiffs' claims that it willfully violated the FLSA.  The Court grants

this motion.[1]

---

[1] The parties raise three other issues in their motions for summary judgment which the Court does not
decide here.  First, Freightquote argues that the Named Plaintiffs are not "similarly situated" under the
FLSA, and therefore conditional class certification of their FLSA claims is inappropriate.  The Court
rejected this argument in its Memorandum and Order granting conditional certification of plaintiffs'
FLSA claims.  Doc. 170 at 1.

Second, Freightquote argues that plaintiffs' proposed KWPA class is overbroad because it covers
employees who did not work in Kansas.  This argument is relevant to plaintiffs' motion for class
certification, not Freightquote's motion for summary judgment.

Third, plaintiffs argue in their opposition to Freightquote's motion for summary judgment that a five-year
statute of limitations applies to their KWPA claims.  By raising this argument for the first time in their

### III. Plaintiffs' Motion for Class Certification

Named Plaintiffs Nancy Koehler, Regina Brisbane, John Smith, and Scott Matney seek class certification of their KWPA claims under Fed. R. Civ. P. 23.  As with their FLSA claims, plaintiffs allege that Freightquote violated the KWPA by failing to pay overtime to Account Representative/Freight Broker, Customer Activation Specialist, and Truckload Coverage Specialist employees.  For the following reasons, the Court denies plaintiffs' motion.

### A.  Legal Standard for Rule 23 Certification

Certification of plaintiffs' proposed classes is governed by Rule 23.  A class action under Rule 23 is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011).  A district court must conduct a "rigorous analysis" to determine whether the putative class satisfies the requirements of Rule 23.  *Comcast v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Dukes*, 131 S. Ct. at 2551.  Under Rule 23(a), "the party seeking certification must demonstrate, first, that:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the class."

*Dukes*, 131 S. Ct. at 2548.  Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b).  Plaintiffs assert that certification here is appropriate under Rule 23(b)(3), which applies when questions of law or fact common to class members predominate over any questions affecting only individual members and when a class action is

---

response brief, plaintiffs have not moved for summary judgment on this issue, and therefore the Court does not address it.

superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

Rule 23 "'does not set forth a mere pleading standard.'"  *Comcast*, 133 S. Ct. at 1432 (quoting *Dukes*, 131 S. Ct. at 2551).  As the party requesting class certification, plaintiffs bear the burden of "affirmatively demonstrat[ing]" compliance with these requirements.  *Id.* (quoting *Dukes*, 131 S.Ct. at 2551).  Plaintiffs "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Dukes*, 131 S. Ct. at 2551 (emphasis in original).  In determining whether plaintiffs have met his burden, the Court "must accept the substantive allegations of the complaint as true," but it does not "blindly rely on conclusory allegations which parrot Rule 23."  *Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004) (quotation omitted).

The Court is not limited to the pleadings but may "'probe behind the pleadings'" and examine the facts and evidence in the case.  *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227-28 (10th Cir. 2013) (quoting *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 160 (1982)); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (rigorous analysis requires judgments about the persuasiveness of evidence).  Actual, not presumed, conformance with Rule 23(a) is required. *Dukes*, 131 S. Ct. at 2551 (quoting *Falcon,* 457 U.S. at 160).  This "rigorous analysis" will "[f]requently . . . entail some overlap with the merits of the plaintiff[s'] underlying claim."  *Id.* But the Court should not conduct a mini-trial to determine if the class actually could prevail on the merits of their claims.  *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95, 1201 (2013); *Dukes,* 131 S. Ct. at 2552 n.6.

The Court has considerable discretion when making class certification decisions.  *Tabor*, 703 F.3d at 1227 (because class certification involves "intensely practical considerations,"

decision lies within discretion of trial court); *see also Bateman v. Am. Multi-Cinema, Inc.*, 623

F.3d 708, 712 (9th Cir. 2010) (district courts in best position to consider most fair and efficient

procedure for litigation).

### B.  Proposed Class Definitions

Plaintiffs ask the Court to certify classes on behalf of each of the three job families at

issue in this case—Account Representatives/Freight Brokers, Customer Activation Specialists,

and Truckload Coverage Specialists—as follows:

> (1) All current and former Account Representatives, and others with similar job titles, duties and compensation structures, who worked for Freightquote in Kansas at any time between August 3, 2007 and the present and were classified as exempt in violation of the FLSA and denied compensation at a rate of one and one-half times their regular rate of pay for all hours worked in excess of forty in a workweek in violation of the KWPA.

> (2) All current and former Customer Activation Specialists, and others with similar job titles, duties and compensation structures, who worked for Freightquote in Kansas at any time between August 3, 2007 and the present and were classified as exempt in violation of the FLSA and denied compensation at a rate of one and one-half times their regular rate of pay for all hours worked in excess of forty in a workweek in violation of the KWPA.

> (3) All current and former Truckload Coverage Specialists, and others with similar job titles, duties and compensation structures, who worked for Freightquote in Kansas at any time between August 3, 2007 and the present and were classified as exempt in violation of the FLSA and denied compensation at a rate of one and one-half times their regular rate of pay for all hours worked in excess of forty in a workweek in violation of the KWPA.

Doc. 143 at 25-26.

### C.  Analysis

The first requirement plaintiffs must satisfy under Rule 23 is numerosity.  Rule 23(a)(1)

requires plaintiffs to show that "the class is so numerous that joinder of all members is

impracticable."  "The numerosity requirement requires examination of the specific facts of each

case and imposes no absolute limitations." *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1214-15 (10th Cir. 2014) (quotation omitted).  Plaintiffs must offer "some evidence of established, ascertainable numbers constituting the class," but there is "no set formula to determine if the class is so numerous that it should be so certified." *Id.* at 1215 (quotation omitted).

The Tenth Circuit has said that the numerosity requirement is not just "a question of numbers." *Id.* (quoting *Horn v. Associated Wholesale Grocers, Inc.,* 555 F.2d 270, 275 (10th Cir.1977)).  Rather, there are a several factors that enter into the impracticability issue. *Id.* Such factors may "'includ[e] the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute.'" *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762, at 206-07 (3d ed. 2005)).  Because it is such a fact-specific inquiry, the Tenth Circuit grants "'wide latitude to the district court in making this determination'" and defers to its determination if the court "'made an appropriate judgment call.'" *Id.* (quoting *Trevizo v. Adams,* 455 F.3d 1155, 1162 (10th Cir. 2006)).

The Court concludes that plaintiffs have failed to meet their burden to show that the classes are so numerous that joinder is impracticable.  Plaintiffs' argument relies entirely on estimates Mr. Zamzow made during his deposition about the size of each class.  Mr. Zamzow estimates that between August 3, 2007 and August 19, 2014 (the date of his deposition), Freightquote employed a total of 1,000-1,500 Account Representatives/Freight Brokers, 30 Customer Activation Specialists, and 100-150 Truckload Coverage Specialists.  As Freightquote points out, however, Mr. Zamzow's estimates encompass employees in the three job families

who worked for Freightquote *nationwide*.  This is a problem because plaintiffs seek certification of three classes of Freightquote employees who worked in *Kansas*.

It is undisputed that throughout the relevant period, Freightquote employed workers outside the state of Kansas.  Indeed, Freightquote moved its headquarters from Kansas to Kansas City, Missouri in June 2013, and it does not appear that Freightquote employs any people in Kansas currently.  Even before June 2013, Freightquote employees worked not just in Kansas, but also in Minnesota, Pennsylvania, and elsewhere.  Although Freightquote had its headquarters in Kansas before June 2013, plaintiffs present no evidence showing what portion of employees in the three subject job categories actually worked in Kansas.  Without more, the Court only could guess about how many employees worked in Kansas during the time period at issue in this case.  The Court declines to make a decision as important as class certification based on guesswork.

The Tenth Circuit has said that the numerosity requirement is not "a question of numbers."  *Id.* (quotation omitted).  But plaintiffs do not even mention the other factors the Tenth Circuit has identified, *i.e.*, "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.* (quotation omitted).  They instead rely entirely on the raw numbers of employees in each category, which, as discussed, shed no light on how many employees worked in Kansas. Because plaintiffs fail to provide evidence of the class sizes or any other factor relevant to the numerosity inquiry, the Court concludes that plaintiffs have not met their burden on this requirement under Rule 23(a)(1).

For this reason alone, the Court denies plaintiffs' motion for class certification and need not engage in the rigorous analysis whether plaintiffs have satisfied the remaining requirements of Rule 23(a) and Rule 23(b)(3).  But in the interests of justice, the Court denies plaintiffs'

motion without prejudice.  Plaintiffs possibly can marshal sufficient evidence on the numerosity requirement, at least for the Account/Representative/Freight Broker class.  *See* Newberg on Class Actions § 7:33 (5th ed.) ("Generally, only if it is clear that a class cannot be certified does a court deny certification with prejudice or without leave to amend.").  Mr. Zamzow testified that 1,000-1,500 employees worked in this job family from August 2007 to August 2014.  To show that joinder is impracticable, plaintiffs merely need to provide some evidence about how many of the subject employees worked in Kansas during the relevant time period, and perhaps touch on other factors that the Tenth Circuit has identified, if they are relevant.  If plaintiffs wish to attempt to discharge their Rule 23 burden on a fuller showing of the facts, they may re-file their motion for class certification no later than August 10, 2015.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Freightquote's Motion for Protective Order (Doc. 172) is denied; Freightquote's Motion for Summary Judgment (Doc. 141) is granted in part and denied in part; plaintiffs' Motion for Partial Summary Judgment (Doc. 145) is denied; and plaintiffs' Motion for Class Certification (Doc. 140) is denied.

**IT IS SO ORDERED.**

**Dated this 10th day of July, 2015, at Topeka, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**