## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NANCY KOEHLER, ET AL., | |
| **Plaintiffs,** | |
| v. | **Case No. 12-2505-DDC-GLR** |
| FREIGHTQUOTE.COM, INC. and FREIGHTQUOTE 401(k) PLAN, | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiffs, on behalf of themselves and others similarly situated, filed this lawsuit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*,[1] alleging that defendant Freightquote.com, Inc.[2] improperly classified them as salaried employees exempt from the FLSA's overtime-pay requirements.  This matter comes before the Court on plaintiffs' Unopposed Motion for Final Approval of Collective Action Settlement and for Approval of Award of Attorney's Fees and Expenses (Doc. 218).  For the reasons explained below, the Court denies the motion without prejudice.

### I.    Factual Background

Plaintiffs Nancy Koehler, Regina Brisbane, John Smith, and Scott Matney are former employees of defendant.  Defendant is a logistics and shipping broker.  It advises customers

---

[1]    Alternatively, plaintiffs assert putative class action claims under Fed. R. Civ. P. 23 for violation of the Kansas Wage Payment Act ("KWPA"), K.S.A. § 44–312 *et seq.*, and the Employee Retirement Income Security Act of 974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  *See* Doc. 76 (Second Amended Complaint) at ¶¶ 1-2.  These claims are not addressed by this Memorandum and Order because they are not part of the FLSA collective action conditional certification.

[2]    Although plaintiffs bring this lawsuit against two defendants, plaintiffs assert their FLSA claims only against defendant Freightquote.com, Inc.  Because this Memorandum and Order addresses only the FLSA claims, the Court uses the word "defendant," singular, to refer to Freightquote.com, Inc.

about ways to ship products, and then it arranges shipments with carriers to meet customer needs.

Plaintiffs have filed putative collective action claims against defendant for alleged violations of the FLSA. *See* Doc. 76 at ¶¶ 5–7, 11. They assert that defendant misclassified employees in three job categories as exempt from the FLSA overtime requirements: (1) Account Representative/Freight Broker, (2) Customer Activation Specialist, and (3) Truckload Coverage Specialist. *Id.* at ¶¶ 8–10. They seek to recover unpaid regular pay, unpaid overtime pay, related penalties and damages, and attorney's fees for themselves and other similarly situated employees. *Id.* at ¶ 11.

On March 18, 2015, the Court conditionally certified plaintiffs' claims as a collective action under 29 U.S.C. § 216(b) for three subclasses of persons:

> (1) Account Representatives: all current and former Account Representatives/Sales Representatives of defendant, and others with similar job titles, duties, and compensation structures, who were classified as exempt and denied compensation at a rate of one and one-half times their regular rate of pay for all hours worked in excess of forty in a workweek;

> (2) Customer Activation Specialists: all current and former Customer Activation Specialists of defendant, and others with similar job titles, duties, and compensation structures, who were classified as exempt and denied compensation at a rate of one and one-half times their regular rate of pay for all hours worked in excess of forty in a workweek; and

> (3) Truckload Coverage Specialists: all current and former Truckload Coverage Specialists of defendant, and others with similar job titles, duties, and compensation structures, who were classified as exempt and denied compensation at a rate of one and one-half times their regular rate of pay for all hours worked in excess of forty in a workweek.

*See* Doc. 170 at 6, 9.

The subclasses "cover employees who worked for defendant in one of these three job categories 'within the three-year period preceding' the Court's Order on their motion for conditional certification." *Id.* at 6. The Court designated plaintiffs Nancy Koehler, Regina

Brisbane, John Smith, and Scott Matney as class representatives and appointed plaintiffs'

counsel, Matthew E. Osman and Kathryn S. Rickley of Osman & Smay, LLP and Amy M. Grace

of ERISA Logic LLC, as class counsel. *Id.* at 17.

Following conditional certification, plaintiffs' counsel retained Class Action

Administration, Inc. ("CAA"), a class action administration company, to manage the FLSA

notice and opt-in process.  On July 22, 2015, CAA mailed the court-approved notice and consent

form via first class U.S. Mail to 1,427 individuals identified as part of the FLSA collective

action.  In response, CAA received 147 consent forms from collective action members.

Ultimately, 164 individuals joined the lawsuit as plaintiffs, including the four class representative

plaintiffs.  Of those collective action members, 152 individuals are members of the Account

Representative subclass, 11 individuals are members of the Truckload Coverage Specialist

subclass, and 1 individual is a member of the Customer Activation Specialist subclass.

On October 13, 2015, the parties participated in a mediation session with Larry Rute, an

experienced mediator in the area of complex wage and hour litigation.  After mediating for

nearly 12 hours, the parties were unable to reach a resolution.  But they agreed to schedule

another mediation session to continue their settlement talks.  On November 2, 2015, the parties

again mediated with Mr. Rute.  The second mediation session lasted nearly nine hours before the

parties reached an impasse.  Mr. Rute then offered a mediator's proposal, and he allowed the

parties to consider the offer for 24 hours.  On November 3, 2015, the parties reached a settlement

agreement in principle.  The parties later executed a Settlement Agreement and Release ("the

Settlement Agreement") memorializing the terms of their settlement.  The parties have submitted

the Settlement Agreement to the Court with plaintiffs' unopposed motion seeking approval of the

settlement. *See* Doc. 219-16.

Under the terms of the Settlement Agreement, defendant agreed to pay a maximum of $5,100,000 (the "Gross Settlement Fund"), which will be allocated as follows:

1.  $20,000 service awards to each of the four representative plaintiffs ($80,000 total);

2.  $1,700,000 (representing one third of the Gross Settlement Fund) to plaintiffs' counsel as payment for all reasonable attorney's fees, costs, and expenses; and

3.  $3,320,000 (the "Net Settlement Fund") to the 164 collective action members distributed on a *pro rata* basis, as described below.[3]

In exchange for the Gross Settlement Fund, plaintiffs have agreed, among other things, to release defendant from all claims that are, could have been, or were asserted in this lawsuit or that arise out of the same operative facts that named plaintiffs and/or collective action members may have against defendant.

The Settlement Agreement provides for a *pro rata* distribution of the Net Settlement Fund to each collective action member who consented to join this lawsuit. A collective action member's *pro rata* distribution is calculated by multiplying: (1) the number of weeks that each collective action member was employed by defendant in one of the three subclasses of jobs during the relevant time period, and (2) the per-week value of work. Plaintiffs' counsel developed this *pro rata* formula after analyzing payroll records that defendant had produced. The payroll records consisted of 12 separate data points between April 2012 and January 2015. Each of the 12 payroll records identified the total amount of compensation paid to each employee within the three subclasses for a randomly selected payroll period in each financial quarter between 2013 and 2015. Using this data, plaintiffs' counsel calculated the average annual compensation for each of the three subclasses.

---

[3]      The amount of the Net Settlement Fund is $3,320,000. That amount is calculated by subtracting the proposed service awards to the four representative plaintiffs ($80,000) and proposed attorney's fee award ($1,700,000) from the Gross Settlement Fund ($5,100,000).

Plaintiffs' counsel calculated that the average annual compensation, including commissions, of Account Representatives, Truckload Coverage Specialists, and Customer Activation Specialists was $59,115.16, $46,374.64, and $34,166.60, respectively.  And, plaintiffs' counsel calculated plaintiffs' "best day" damages using 50 hours of work as a baseline.  Counsel determined that plaintiffs' maximum damages (including liquidated damages) over a three-year period were approximately $5,806,049.52.

Plaintiffs' counsel also created a damage calculation model based on the average annual compensations.  Counsel could change and update this model during settlement negotiations by revising the total number of overtime hours that each of the subclasses purportedly worked.  Counsel thus could use the model to calculate the amount of class wide damages.

Applying the model, plaintiffs' counsel created a "baseline calculation" to use to determine the allocation of any settlement in the case.  The baseline calculation revealed that 88.37% of the damages are attributable to the Account Representative subclass, 11.21% of the damages are attributable to the Truckload Coverage subclass, and 0.42% of the damages are attributable to the Customer Activation subclass.

After the parties reached a settlement, plaintiffs' counsel applied the baseline calculation to the Net Settlement Fund ($3,320,000) to determine the allocation amount to each subclass. Plaintiffs' counsel thus calculated the following allocations:  (1) $2,933,884 (which is 88.37% of the Net Settlement Fund) to the Account Representative subclass; (2) $372,172 (which is 11.21% of the Net Settlement Fund) to the Truckload Coverage Specialist subclass; and (3) $13,944 (which is 0.42% of the Net Settlement Fund) to the Customer Activation Specialist subclass. Then, to determine the per-week value of work, plaintiffs' counsel divided each allocation amount by the total number of workweeks worked by plaintiffs in that subclass during the four

5

years before the date when each plaintiff consented to join the lawsuit.  Plaintiffs' counsel determined that:  (1) the Account Representatives worked 13,096.01 workweeks, entitling them to $224.03 per workweek; (2) the Truckload Coverage Specialists worked 1,708.56 workweeks, entitling them to $217.83 per workweek;[4] and (3) the Customer Activation Specialists worked 78.29 workweeks, entitling them to $178.11 per workweek.[5]  Plaintiffs propose calculating each collective action member's settlement amount by multiplying the number of weeks that the collective action member worked for defendant with the per-week value of work for the appropriate subclass.  Plaintiffs support this distribution of the Net Settlement Fund, and 12 of the plaintiffs (including the four named plaintiffs) have submitted declarations stating that they support approval of the settlement as fair and reasonable.  Defendant does not object to plaintiffs' proposed allocation of the Net Settlement Fund.

Plaintiffs' counsel represents that the Net Settlement Fund constitutes approximately 57% of the "best day value" of this case—depending on how the damages are calculated.  The Settlement Agreement provides for an average payout to each plaintiff of $20,243.90.  The average payout to Account Representatives is $19,301.87, the average payout to Customer Activation Specialists is $13,944.00, and the average payout to Truckload Coverage Specialists is $33,833.82.   Plaintiffs support this distribution of the Net Settlement Fund, and 12 of the

---

[4]     The Settlement Agreement appears to contain a typographical error.  It states that plaintiffs propose an allocation of 11.21% of the Net Settlement Fund ($372,172) to the Truckload Coverage Specialists, that this subclass of employees worked 1,708.56 workweeks, and thus plaintiffs determined that Truckload Coverage Specialists shall receive "approximately $217.87" per work week.  Doc. 219-16 at ¶ 1.8.  Plaintiffs correctly state in their Memorandum that this calculation amounts to $217.83 per work week.  Doc. 219 at 14 & n.4.

[5]     The Settlement Agreement appears to contain a second typographical error.  It states that plaintiffs propose an allocation of 0.42% of the Net Settlement Fund ($13,944) to the Customer Activation Specialists, that this subclass of employees worked 78.29 workweeks, and thus plaintiffs determined that Customer Activation Specialists shall receive "approximately $178.34" per work week.  Doc. 219-16 at ¶ 1.8.  Plaintiffs correctly state in their Memorandum that this calculation amounts to $178.11 per work week.  Doc. 219 at 14 & n.4.

plaintiffs (including the four named plaintiffs) have submitted declarations stating that they support approval of the settlement as fair and reasonable.

## II.     Legal Standard

### A.  FLSA Collective Action Settlement

The parties to an FLSA action must present a settlement of those claims to the Court for review and a determination that the settlement is fair and reasonable. *Barbosa v. Nat'l Beef Packing Co., LLC.*, No. 12-2311-KHV, 2015 WL 4920292, at *3 (D. Kan. Aug. 18, 2015) (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (10th Cir. 1982)). "To approve an FLSA settlement, the Court must find that the litigation involves a bona fide dispute and that the proposed settlement is fair and equitable to all parties concerned." *Id.* (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1353).

The Court may enter a stipulated judgment in an FLSA action "only after scrutinizing the settlement for fairness." *Id.* (citing *Peterson v. Mortg. Sources, Corp.*, No. 08-2660-KHV, 2011 WL 3793963, at *4 (D. Kan. Aug. 25, 2011); *see also Tommey v. Computer Scis. Corp.*, No. 11-CV-02214-EFM, 2015 WL 1623025, at *1 (D. Kan. Apr. 13, 2015) (citation omitted). "If the settlement reflects a reasonable compromise over issues such as FLSA coverage or computation of back wages that are actually in dispute, the Court may approve the settlement to promote the policy of encouraging settlement of litigation." *Gambrell v. Weber Carpet, Inc.*, No. 10-2131-KHV, 2012 WL 5306273, at *2 (D. Kan. Oct. 29, 2012) (citing *Lynn's Food Stores*, 679 F.2d at 1354).

Also, when parties settle FLSA claims before the Court has made a final certification ruling, the Court must make some final class certification finding before it can approve an FLSA

collective action settlement. *Barbosa*, 2015 WL 4920292, at *3 (citing *McCaffrey v. Mortg. Sources, Corp.*, No. 08-2660-KHV, 2011 WL 32436, at *2 (D. Kan. Jan. 5, 2011)).

## B.  Attorney's Fees Under the FLSA

The FLSA requires the parties to include in the settlement agreement an award of reasonable attorney's fees and the costs of the action.  29 U.S.C. § 216(b); *see also McCaffrey*, 2011 WL 32436, at *2 (citing *Lee v. The Timberland Co.*, No. C 07-2367-JF, 2008 WL 2492295, at *2 (N.D. Cal. June 19, 2008)).  The Court has discretion to determine the amount and reasonableness of the fee, but the FLSA fee award nevertheless is mandatory. *Barbosa*, 2015 WL 4920292, at *3 (citations omitted).

## III.    Analysis

Plaintiffs have filed an Unopposed Motion for Final Approval of Collective Action Settlement and For Approval of Award of Attorney's Fees.  In their motion, plaintiffs ask the Court to certify a final collective action, approve the settlement as fair and reasonable, and award the proposed attorney's fees and costs in an amount equal to one-third of the settlement.  The Court addresses these requests, in turn, below.

## A.  Final Collective Action Certification

Because the parties have settled their FLSA claims before the Court made a final certification ruling, the Court must make some final class certification finding before it can approve the settlement. *See Barbosa*, 2015 WL 4920292, at *3 (citing *McCaffrey*, 2011 WL 32436, at *2).  The FLSA provides that an employee may bring a collective action on behalf of other employees who are "similarly situated."  29 U.S.C. § 216(b).  To determine whether plaintiffs are "similarly situated" for purposes of final collective action certification, the Court considers several factors including:  "(1) the disparate factual and employment settings of

individual plaintiffs; (2) various defenses available to defendant[s] which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Gambrell*, 2012 WL 5306273, at *3 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102–03 (10th Cir. 2001)).

Plaintiffs ask the Court to certify a final collective action for three subclasses of plaintiffs who worked in one of three job categories for defendant within the three-year period before the Court's Order granting conditional collective action certification:  (1) Account Representatives; (2) Truckload Coverage Specialists, and (3) Customer Activation Specialists.  For purposes of the settlement approval motion, the parties stipulate that the jobs in each subclass share similar job duties, and thus the plaintiffs in each subclass are similarly situated.  Because they are similarly situated, the parties agree that final certification of each subclass is warranted.

The Court cannot rely on this stipulation alone, however, to grant final certification and thus it examines the *Thiessen* factors listed above.  For the first factor, plaintiffs contend that the employees in each subclass share the same exempt classification, the same job duties, the same compensation, and sufficient employment similarities to justify final certification.

Plaintiffs assert that employees in the Account Representative job category are similarly situated because:  (1) they work in the sales department; (2) their job duties are selling defendant's shipping solutions services to customers; (3) they are classified as exempt from overtime; and (4) they have had the same job duties, job requirements, and compensation since 2007.  Plaintiffs also explain that while employees in this job category may have different job titles, those job titles merely reflect seniority and/or the size of the employee's book of business, and not any difference in primary job duties because the job duties within this category are essentially the same.

Plaintiffs contend that employees in the Customer Activation Specialists job category also are similarly situated because:  (1) they work in the sales department; (2) their job duties are essentially the same as Account Representatives in that they sell defendant's shipping solution services to customers; (3) they have the same job duties and the different job titles within the job category do not reflect any real difference in those job duties; (4) they are classified as exempt from overtime; and (5) they have had the same job duties, job requirements, and compensation since 2007.

And, plaintiffs assert that employees in the Truck Coverage Specialists job category are similarly situated because:  (1) they perform essentially the same job duties that require them to find and negotiate with carriers who ship loads to defendant's customers; (2) the difference in job titles within this category do not reflect any real difference in job duties because the job duties are essentially the same; (3) they are classified as exempt from overtime; and (4) they have had the same job duties, job requirements, and compensation since 2007.

These facts demonstrate that the disparate factual and employment settings of individual plaintiffs are similar, and thus the first factor weighs in favor of final collective action certification for each of the three subclasses.

For the second factor, plaintiffs assert they are unaware of any defenses that exist for any particular individuals within each subclass.  All the employees in each subclass are classified as exempt from the overtime requirements from the FLSA.  Defendant asserts, in contrast, it properly classified the employees as exempt, and defendant has not asserted any defenses against any individual employee in the case.  If defendant prevailed on its argument by establishing that the employees are classified properly as exempt, the claims of all employees in each subclass would fail because this argument applies to the entire subclass, not merely individual employees.

Also, the employees in each subclass were subject to the same employment policies, practices, and procedures that plaintiffs allege violate the FLSA.  So, any defense asserted by defendant applies equally to all employees in each subclass—and not just individuals within it—because all employees are subject to the same policies.  The second factor also weighs in favor of final collective action certification.

Finally, the third factor—fairness and procedural considerations—weighs in favor of final collective action certification.  Allowing plaintiffs to pool their resources for litigation favors collective action treatment.  *See Barbosa*, 2015 WL 4920292, at *5 (citing *Fulton v. TLC Lawn Care, Inc.*, No. 10-2645-KHV, 2012 WL 1788140, at *3 (D. Kan. May 17, 2012)).  Also, the policy encouraging settlement of litigation also favors final collective action certification. *Gambrell*, 2012 WL 5306273, at *4 (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1354).

After considering the *Thiessen* factors, the Court concludes that final collective action certification is appropriate here.  The Court thus certifies a final collective action consisting of the three subclasses.

### B.  FLSA Collective Action Proposed Settlement

Plaintiffs next ask the Court to approve the proposed Settlement Agreement (Doc. 219-16).  As explained above, when parties settle FLSA claims, they must present the settlement to the Court to review and decide whether the settlement is fair and reasonable.  *Tommey*, 2015 WL 1623025, at *1; *see also Gambrell*, 2012 WL 5306273, at *2 (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1352) ("When employees file suit against their employer to recover back wages under the FLSA, the parties must present any proposed settlement to the district court for review and a determination whether the settlement is fair and reasonable.").  To approve an FLSA settlement, the Court must determine whether:  (1) the litigation involves a bona fide dispute, (2)

11

the proposed settlement is fair and equitable to all parties, and (3) the proposed settlement

contains an award of reasonable attorney's fees. *Barbosa*, 2015 WL 4920292, at \*5 (citing

*McCaffrey*, 2011 WL 32436, at \*2). The Court addresses each consideration below.

### a. Bona Fide Dispute

Before approving a settlement of FLSA claims, the parties must submit sufficient

information for the Court to conclude that a bona fide dispute exists. *McCaffrey*, 2011 WL

32436, at \*4 (citing *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1241 (M.D. Fla. 2010)). To

satisfy this obligation, the parties must provide the Court with: (1) a description of the nature of

the dispute; (2) a description of the employer's business and the type of work performed by the

employees; (3) the employer's reasons for disputing the employees' right to a minimum wage or

overtime; (4) the employees' justification for the disputed wages; and (5) if the parties dispute

the computation of wages owed, each parties' estimate of the number of hours worked, and the

applicable wage. *Id.* In their memorandum supporting their motion, plaintiffs provide the Court

with each of the five types of information described above. Doc. 219 at 23–27.

Plaintiffs assert that a bona fide dispute exists because the parties dispute whether

defendant properly compensated employees in the three subclasses of job categories. Plaintiffs

allege that defendant violated the FLSA by regularly requiring them to work overtime without

compensating them for hours worked in excess of a forty-hour work week. Defendant denies

that it violated the FLSA because, it contends, it properly classified plaintiffs as administratively

exempt from the overtime and minimum wage compensation requirements of the FLSA. The

parties filed cross-motions for summary judgment on this issue—that is, whether plaintiffs

qualify as exempt under the FLSA's administrative exemption. *See* Docs. 141 & 145. And the

Court determined that genuine issues of material fact existed and thus precluded summary

judgment for either plaintiffs or defendant. *See* Doc. 180 at 25–42, 53. The Court thus concludes that the claims in this case present a bona fide dispute about FLSA provisions, with the potential for either side to prevail if the case continued.

### b. Fair and Equitable

The Court next considers whether the proposed settlement is fair and reasonable. "To be fair and reasonable, an FLSA settlement must provide adequate compensation to the employee and must not frustrate the FLSA policy rationales." *Solis v. Top Brass, Inc.*, No. 14-cv-00219-KMT, 2014 WL 4357486, at *3 (D. Colo. Sept. 3, 2014). To determine if the proposed settlement is fair and equitable, courts regularly examine the factors that apply to proposed class action settlements under Rule 23(e). *Barbosa v. Nat'l Beef Packing Co., LLC.*, No. 12-2311-KHV, 2014 WL 5099423, at *7 (D. Kan. Oct. 10, 2014); *Tommey*, 2015 WL 1623025, at *2. Those factors include: "(1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable." *Barbosa*, 2014 WL 5099423, at *7; *Tommey*, 2015 WL 1623025, at *2. "If the settlement reflects a reasonable compromise over issues such as FLSA coverage or computation of back wages that are actually in dispute, the Court may approve the settlement to promote the policy of encouraging settlement of litigation." *Gambrell*, 2012 WL 5306273, at *2 (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1354).

Plaintiffs assert that the proposed settlement satisfies each factor listed above. The Court agrees. First, the Court concludes that the settlement was fairly and honestly negotiated. The parties convened two full-day mediations with Larry Rute, a mediator with significant

13

experience mediating complex wage and hour lawsuits, and they eventually reached a settlement after arms-length negotiations through the mediation.  Second, it appears that the case involves serious questions of law and fact, and those claims place the ultimate outcome of the litigation in doubt.  In particular, as the Court discussed in its summary judgment order, it is uncertain whether defendant properly classified plaintiffs as exempt, and, if not, how much overtime compensation is owed to them.  Third, the Settlement Agreement provides the value of an immediate recovery to plaintiffs now and outweighs the mere possibility of future relief after protracted and expensive litigation.  And fourth, the parties assert that the settlement is fair and reasonable.  After consideration, the Court finds that all four factors weigh in favor of approval of the settlement.

But while these factors may demonstrate that the settlement agreement is fair and reasonable, they are not determinative.  *See McCaffrey*, 2011 WL 32436, at *5 (explaining that the Rule 23(e) factors "provide a general framework for the Court's determination whether an FLSA settlement is fair, but they are not determinative").  In addition to the four factors listed above, the Court also must determine "that the proposed settlement is fair and equitable to all parties in light of the history and policy of the FLSA." *Gambrell*, 2012 WL 5306273, at *5.  The Court thus examines several additional considerations to determine whether the Settlement Agreement is fair and equitable including:  (i) notice of the proposed settlement; (ii) the *pro rata* distribution method of the Net Settlement Fund; (iii) the Settlement Agreement's confidentiality provisions; and (iv) the proposed service awards to the named plaintiffs.

### i.  Notice of the Proposed Settlement

The FLSA does not require a fairness hearing like that required for settlements of class actions brought under Fed. R. Civ. P. 23. *Tommey*, 2015 WL 1623025, at *1.  But courts

routinely hold fairness hearings in FLSA actions unless the parties demonstrate that the opt-in plaintiffs had notice of the settlement and an opportunity to object. *Stubrud v. Daland Corp.*, No. 14-2252-JWL, 2015 WL 5093250, at *1 (D. Kan. Aug. 28, 2015) (citing *Tommey*, 2015 WL 1623025, at *1; *Goldsby v. Renosol Seating, LLC*, No. 2:08-0148-KD-N, 2013 WL 6535253, at *10 (S.D. Ala. Dec. 13, 2013)). A explained below, plaintiffs have submitted sufficient information to establish that the 164 opt-in plaintiffs had notice of the settlement and opportunity to object. Thus, the Court has decided that it need not hold a fairness hearing.

Also, plaintiffs' counsel has explained the steps he has taken to provide notice to the 164 opt-in plaintiffs. On January 27, 2016, plaintiffs' counsel mailed a Notice of Proposed Settlement (Doc. 219-17) to each plaintiff in this lawsuit. Plaintiffs' counsel also enclosed in the mailing a Release for each plaintiff's signature (Doc. 219-18) and IRS Forms W-4 and W-9. The Notice explained:  (1) the terms of the settlement; (2) how to participate in the settlement; (3) the individual amount that the individual plaintiff would receive; (4) the tax consequences of the amount received; (5) how to object to the settlement; and (6) how to contact plaintiffs' counsel should the individual have questions or seek additional information. Doc. 219-17. The Notice also required plaintiffs, if they wished to participate in the settlement, to complete and return the Release and IRS Forms by February 10, 2016, and, if they wished to object to the settlement, to mail written objections to plaintiffs' counsel by the same date—February 10, 2016. *See* Doc. 219 at 15.

On January 29, 2016, plaintiffs' counsel sent an email to all plaintiffs (except for one plaintiff who did not provide plaintiffs' counsel with a valid email address). It informed them that they should expect to receive a packet by mail with important documentation about the proposed settlement in this case. Beginning on February 3, 2016, and continuing through

February 12, 2016, plaintiffs' counsel began calling each plaintiff to ensure he or she had received the Notice of Proposed Settlement in the mail and to ask if he or she had any questions for the attorneys about the proposed settlement.  Ultimately, plaintiffs' counsel spoke to some 121 of the 164 plaintiffs who have joined this lawsuit about their rights under the proposed settlement.  And, plaintiffs' counsel eventually received Releases and Tax Forms from 162 of the 164 opt-in plaintiffs.  Plaintiffs' counsel has not received any written objections to the proposed settlement.

Two individuals did not sign and return the Release and Tax Forms.  The Court is convinced that plaintiffs' counsel made sufficient efforts to provide these two individuals notice of the proposed settlement.  Plaintiffs' counsel can confirm that they received the Notice of Proposed Settlement mailed on January 27, 2016, because plaintiffs' counsel received certified mail receipts showing that both plaintiffs received the mailing at their addresses of record.  In addition, plaintiffs' counsel's staff attempted to contact these two plaintiffs by telephone on at least two occasions, leaving voice mail messages in their personal voicemail boxes.  Plaintiffs' counsel's staff also emailed these two individuals twice, and none of the emails were returned as undeliverable.  Plaintiffs' counsel's staff also sent two certified mailings to the address of record for these two individuals as well as to another, potential address for each plaintiff after conducting a public records search.

Based on these facts, where all but two of the opt-in plaintiffs have approved the proposed settlement, the Court concludes that the opt-in plaintiffs had notice of the settlement and opportunity to object.  *See*, *e.g.*, *Moore v. Ackerman Inv. Co.*, No. C 07-3058-MWB, 2009 WL 2848858, at *2–3 (N.D. Iowa Sept. 1, 2009) (approving an FLSA settlement without a hearing after a "substantial majority" of the opt-in plaintiffs (64%) responded to the proposed

settlement and those responding had overwhelmingly approved the proposed settlement (98% of responding plaintiffs and 63% of all plaintiffs)).  The Court thus finds that notice of the proposed settlement to the plaintiffs was sufficient and favors approval of the settlement.

### ii.  Distribution of Net Settlement Proceeds

As described above, the Settlement Agreement requires distribution of the Net Settlement Fund on a *pro rata* basis derived from each collective action member's number of weeks employed in one of the three subclasses of jobs during the relevant time period, multiplied by the estimated per-week value of the employee's work.  Plaintiffs' counsel developed this *pro rata* formula after analyzing payroll records that defendant produced and calculating the average compensation for each of the three subclasses.  Then, plaintiffs' counsel created a damage calculation model that he could change and update during settlement negotiations by revising the total number of overtime hours that each of the subclasses allegedly worked.

Using this model, plaintiffs' counsel created and used a "baseline calculation" to determine the allocation of any settlement and concluded that 88.37% of the damages are attributable to the Account Representative subclass, 11.21% of the damages are attributable to the Truckload Coverage subclass, and 0.42% of the damages are attributable to the Customer Activation subclass.

After the parties reached a settlement, plaintiffs' counsel applied the baseline calculation to the Net Settlement Fund ($3,320,000) to determine the amount allocated to each subclass. Thus, plaintiffs' counsel calculated the following allocations:  (1) $2,933,884 (which is 88.37% of the Net Settlement Fund) to the Account Representative subclass; (2) $372,172 (which is 11.21% of the Net Settlement Fund) to the Truckload Coverage Specialist subclass; and (3) $13,944 (which is 0.42% of the Net Settlement Fund) to the Customer Activation Specialist

subclass.  Then, to determine the per-week value of work, plaintiffs' counsel divided the allocation amount by the total number of workweeks worked by plaintiffs during the four-year period before the date that each plaintiff consented to join the lawsuit.  Plaintiffs propose calculating each collective action member's settlement amount by multiplying the number of weeks that the collective action member worked for defendant by the estimated per-week value of work for the appropriate subclass.

Plaintiffs' counsel represents that the Net Settlement Fund represents approximately 57% of the "best day value" of this case, depending on how one calculates the damages.  Plaintiffs support this distribution of the Net Settlement Fund, and 12 of the plaintiffs (including the four named plaintiffs) have submitted declarations stating that they support approval of the settlement as fair and reasonable.  And defendant does not object to plaintiffs' proposed allocation of the Net Settlement Fund.

Based on plaintiffs' counsel representations, the proposed distribution of the Net Settlement Fund appears fair and reasonable.  Indeed, among cases decided by this Court, Judge Robinson approved a similar distribution method that calculated a collective action members' damages based on the total number of weeks that an individual worked in the employment position, and that settlement represented about 30% of the collective action members' "best day" damages.  *See* Memorandum in Support of Joint Motion for Approval of Settlement at 5, 20, *Berry v. Farmers Bank & Tr., N.A.*, No. 13-2020-JAR-DJW (D. Kan. Dec. 11, 2013), ECF No. 22; Exhibit 1 (Settlement Agreement) to Memorandum in Support of Joint Motion for Approval of Settlement at ¶ A.1.a., *Berry v. Farmers Bank & Tr., N.A.*, No. 13-2020-JAR-DJW (D. Kan. Dec. 11, 2013), ECF No. 22-1; Order Granting Approval of FLSA Settlement at ¶ 4, *Berry v. Farmers Bank & Tr., N.A.*, No. 13-2020-JAR-DJW (D. Kan. Dec. 17, 2013), ECF No. 23.  The

Court thus concludes that the proposed distribution in this case represents a fair and equitable

allocation of the Net Settlement Fund.

### iii.  Confidentiality Clause

The Settlement Agreement contains a confidentiality provision.  It provides:

> The Parties will treat the Agreement, including the payments received hereunder, as confidential, except that (1) the Parties may disclose the terms and provisions of this Agreement to the extent necessary to obtain Court approval; (2) the Parties may inform their accountants, auditors, spouses, tax consultants, attorneys or other advisors with whom they have a confidential relationship, and may disclose information as required to taxing authorities; and (3) Defendants may disclose information related to this Settlement as necessary for the conduct of its business.

Doc. 219-16 at ¶ 16.1.  The Settlement Agreement also prohibits plaintiffs from publishing facts

about the settlement and includes a liquidated damages provision for violation of the

confidentiality clause, as follows:

> Regardless of whether some or all information related to the settlement is filed in the public records, the Named Plaintiffs, Collective Action Members, and Plaintiffs' Counsel specifically acknowledge and agree that they will not publish the facts of the settlement, the Gross Settlement Fund, individual payment amounts and/or the amount of attorneys' fees and expenses via any means, including but not limited to press releases, postings on websites or via social media, written, electronic or other media or oral communication of any kind. Provided, however, that the Named Plaintiffs and Collective Action Members may inform their accountants, auditors, spouses, tax consultants, attorneys or other advisors with whom they have a confidential relationship and may disclose information as required to taxing authorities and Plaintiffs' counsel may communicate with their tax advisors and taxing authorities.  The Named Plaintiffs and Collective Action Members expressly acknowledge that any publication by spouses, financial advisors and/or tax advisors shall be attributed to the individual Named Plaintiffs and/or Collective Action Member involved.  Furthermore, the Named Plaintiffs, the Collective Action Members, and Plaintiffs' Counsel acknowledge that this provision is a material term of the Agreement and the Named Plaintiffs, Collective Action Members, and Plaintiffs' Counsel agree the breaching party shall pay $1,000.00 in liquidated damages for each violation, not to exceed the total amount of each Named Plaintiff's or Collective Action Member's individual settlement amount.

*Id.* at ¶ 16.2.

The Court cannot approve an FLSA settlement that imposes a confidentiality clause. It is well-settled that a confidentiality provision in an FLSA agreement, such as the one included in the Settlement Agreement here, "'contravenes the legislative purpose of the FLSA and undermines the Department of Labor's regulatory effort to notify employees of their FLSA rights.'" *Barbosa*, 2014 WL 5099423, at *8 (quoting *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1242 (M.D. Fla. 2010)). Indeed, our Court recognizes the "broad consensus that FLSA settlement agreements should not be kept confidential and the court will not approve an agreement that prohibits and penalizes class members for sharing information about the settlement with others, particularly defendants' employees." *Stubrud*, 2015 WL 5093250, at *1 (citations omitted). Our Court consistently has refused to approve FLSA settlement agreements, like this one, that prohibit class members from disclosing the terms except in narrow circumstances. *See id.*; *see also Barbosa*, 2014 WL 5099423, at *8. For this reason, the Court cannot approve the Settlement Agreement in this case because it includes the confidentiality provisions.

### iv.  Service Award

The Court also must examine any service award payments to determine whether they are fair and reasonable. *See Tommey*, 2015 WL 1623025, at *2; *Grove v. ZW Tech, Inc.*, No. 11-2445-KHV, 2012 WL 1789100, at *7 (D. Kan. May 17, 2012). Here, plaintiffs ask the Court to approve service awards in the amount of $20,000 to each of the four representative plaintiffs. Plaintiffs assert that this amount is reasonable and thus the Court should approve the service awards.

In support of their argument, plaintiffs cite case law from other jurisdictions where the courts have approved service awards when they represent a reasonable portion of the total

settlement amount.  *See*, *e.g.*, *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) (approving $10,523.27 service award that represented 8.4% of the settlement fund); *Chambery v. Tuxedo Junction Inc.*, No. 12-cv-06539 EAW, 2014 WL 3725157, at *11 (W.D.N.Y. July 25, 2014) (approving service awards of $3,500 to one named plaintiff, $1,000 to two other named plaintiffs, $1,000 to participating class members who submitted affidavits in the case, and $200 to participating class members who consented to join the suit—the total of which amounted to 5% of the total settlement fund); *Toure v. Amerigroup Corp.*, No. 10 Civ. 5391(RLM), 2012 WL 3240461, at *6 (E.D.N.Y. Aug. 6, 2012) (approving service awards of $10,000 to two named plaintiffs and $5,000 to six opt-in plaintiffs which represented 1.1% of the total settlement); *Lovaglio v. W & E Hosp., Inc.*, 10 CIV 7351(LLS), 2012 WL 2775019, at *4 (S.D.N.Y. July 6, 2012) (approving $10,000 service awards to three named plaintiffs representing 2.4% of the total settlement).

Here, the total amount of the requested service awards ($80,000) is 1.6% of the Gross Settlement Fund ($5,100,000).  But, although courts in the cases cited above have approved service awards representing larger percentages of a total settlement fund, a proposed award here of $20,000 to each of the four plaintiffs is significantly greater than the amounts the individual plaintiffs received in those cases.  *See*, *e.g.*, *Frank*, 228 F.R.D. at 187 ($10,523.27 service award); *Chambery*, 2014 WL 3725157, at *11 (service awards of $3,500, $1,000, and $200); *Toure*, 2012 WL 3240461, at *6 (service awards of $10,000 and $5,000); *Lovaglio*, 2012 WL 2775019, at *4 ($10,000 service awards).

And, our Court has found requested service awards unreasonable if the proposed award does not adequately reflect the amount of time that the recipient plaintiff spent working on the lawsuit, even in cases where the aggregate value of the settlement is significant.  *See In re Sprint*

*Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1271 (D. Kan. 2006) (reducing requested service awards to each of the four named plaintiffs from $15,000 to $5,000, even though the total settlement exceeded $25 million, because the $5,000 award adequately compensated each plaintiff for the 80 hours of time, on average, that each devoted to the lawsuit); *see also Barbosa*, 2015 WL 4920292, at *6 (rejecting proposed service award of $3,500 to each of the two named plaintiffs who spent 24.1 hours and 9.6 hours respectively on the case, and instead concluding that $20 per hour for the time plaintiffs spent on the case was a fair and reasonable service award); *Bruner v. Sprint/United Mgmt. Co.*, Nos. 07-2164-KHV, 08-2133-KHV, 08-2149-KHV, 2009 WL 2058762, at *11 (D. Kan. July 14, 2009) (rejecting $10,000 proposed service award to the named plaintiff in an $8.7 million settlement because plaintiff failed to provide specific details about the amount of time she invested in the suit and awarding a $5,000 service award instead).

According to their own estimates, the representative plaintiffs here devoted the following time to the lawsuit:  Nancy Koehler spent 218.5 hours (Doc. 219-8 at 1–2), Regina Brisbane spent 39.2 hours (Doc. 219-4 at 1), John Smith spent 137.75 hours (Doc. 219-13 at 1–2), and Scott Matney spent 19.6 hours (Doc. 219-11 at 1–2).  Based on these estimates, the Court finds it unreasonable to award each named plaintiff $20,000 for their service, especially when two of the named plaintiffs spent less than 40 hours working on the case.

Plaintiffs also assert that the proposed service awards are justified based on the personal risk they took by bringing this lawsuit.  They contend that they have placed their employment reputations at risk by suing a current or former employer.  They note that because this lawsuit is publically filed, information about their participation in the lawsuit is easily accessible.  For example, they explain that internet searches of certain plaintiffs' names return information about

this lawsuit.  While the Court recognizes that plaintiffs assumed some risk to their reputations by bringing this action, it cannot conclude that this risk justifies the significant service award amounts plaintiffs request here.

Based on the guidance our Court has given in similar cases, the Court determines that plaintiffs' request for $20,000 service awards for the four representative plaintiffs would grant them a disproportionate windfall compared to the amount of time they devoted to this case.  The Court thus cannot approve the proposed service award here.  If the parties intend to seek approval of a revised settlement agreement, they must reduce the proposed service award in that revised agreement to an amount that more properly reflects the time the representative plaintiffs invested in this lawsuit.  Otherwise, the Court will reduce the service award to an amount it determines fair and equitable.

### C.  Attorney's Fees and Costs

Because plaintiffs have failed to show that the proposed settlement award is fair and equitable, the request for attorney's fees and costs is premature.  The Court notes, however, that defendant agreed not to contest plaintiffs' request for attorney's fees and costs.  See Doc. 219-16 at ¶ 4.1.  "When a settlement agreement is reached and defendant agrees to not oppose an award of attorneys' fees from a common fund, defendant has no incentive to bargain for lower fees." *Barbosa*, 2014 WL 5099423, at *9.  In those circumstances, our Court "skeptically examine[s] and analyze[s] the fee and cost proposal." *Id.* (citing *Bruner*, 2009 WL 2058762, at *10).  Here, plaintiffs' counsel has submitted a significant amount of information to justify the fee request. Still, if the parties decide to reformulate and resubmit their proposed settlement, the Court advises that it will apply our Court's standard of scrutiny to any request for attorney's fees and costs.

## IV.     Conclusion

In sum, the Court cannot approve the Settlement Agreement here.  The Court concludes that the confidentiality provisions and proposed service awards are not fair and equitable to all parties.  The Court thus denies plaintiffs' Unopposed Motion for Final Approval of Collective Action Settlement and for Approval of Award of Attorney's Fees and Expenses without prejudice to refiling.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Unopposed Motion for Final Approval of Collective Action Settlement and for Approval of Award of Attorney's Fees and Expenses (Doc. 218) is denied without prejudice to refiling.

**IT IS FURTHER ORDERED BY THE COURT THAT** the parties must notify this court **on or before May 6, 2016** of their intention to either (1) file a revised settlement agreement and supporting documentation in accordance with this Memorandum and Order; or (2) abandon settlement and proceed to litigate this dispute.

**IT IS SO ORDERED.**

**Dated this 11th day of April, 2016, at Topeka, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**